## OREGON-WASHINGTON RAILROAD & NAVIGATION COMPANY *v.* STATE OF WASHINGTON.

ERROR TO THE SUPREME COURT OF THE STATE OF WASHINGTON.

No. 187.   Argued January 28, 1926.—Decided March 1, 1926.

1. The power of the States to quarantine against importation of farm produce likely to convey injurious insects from infested localities, was suspended, in so far as concerns interstate commerce, by the Act of August 20, 1912, as amended March 4, 1917, investing the Secretary of Agriculture with full authority over the subject. P. 96.

2. This Act of Congress can not be construed as leaving the States at liberty to establish such quarantines in the absence of action by the Secretary of Agriculture.   P. 102.

3. A quarantine proclaimed by the State of Washington under Ls. 1921, c. 105, against importation of alfalfa hay and alfalfa meal, except in sealed containers, coming from designated regions in other States found to harbor the alfalfa weevil, is therefore inoperative. Pp. 93, 102.

128 Wash. 365, reversed.

ERROR to a judgment of the Supreme Court of Washington affirming a decree, in a suit instituted by the State, permanently enjoining the Railroad Company from transporting through the State consignments of alfalfa hay and meal from other designated States or parts thereof, in disregard of a quarantine.

*Mr. Arthur C. Spencer,* with whom *Messrs. Henry W. Clark* and *F. T. Merritt* were on the brief, for plaintiff in error.

*Mr. R. G. Sharpe,* with whom *Mr. John H. Dunbar* was on the brief, for defendant in error.

The reasonableness of a quarantine regulation must in all cases be determined by the exigencies of the particular problem confronting the commonwealth, and the quarantine order here involved is no more drastic than the evi-

dence shows the situation demanded. *Railroad Company v. Husen,* 95 U. S. 465, distinguished. See *Rasmussen* v. *Idaho,* 181 U. S. 198; *State* v. *Rasmussen,* 7 Idaho 1; *Smith* v. *Railroad Co.,* 181 U. S. 248; *Compagnie Française De Navigation à Vapeur* v. *Board of Health,* 186 U. S. 380; *Schollenberger* v. *Commonwealth of Pennsylvania,* 171 U. S. 1.

The federal act does not conflict with the state law and, in any event, the former merely delegates to the Secretary of Agriculture the right to quarantine any district which he finds, after a public hearing, to be infected by a dangerous plant disease or insect infestation, and until the Secretary of Agriculture has actually caused such a public hearing to be had and has fixed, or refused to fix, quarantine lines as contemplated by § 8 of the Act, it cannot be said that Congress has occupied the field covered by the state quarantine law.

Clearly the fact that Congress has merely delegated to an executive officer the power which it itself has to enact police regulations affecting the welfare of the several States does not mean that it has deprived the several States of the right to protect their own agricultural industries by proper police regulations of their own, at least until the delegated power has been actively exercised by the executive officer. *Missouri Pacific Ry. Co.* v. *Larabee Flour Mills Co.,* 211 U. S. 612; *Railway Co.* v. *Harris,* 234 U. S. 412; *Atlantic Coast Line R. R.* v. *Commonwealth, etc.,* 136 Va. 134.

It is argued by the Railroad that the Act of Congress makes it obligatory upon the Secretary of Agriculture to establish a quarantine " when he shall determine that such a quarantine is necessary." But he is merely authorized and not required to have a public or other hearing for the purpose of determining whether a particular district should or should not be quarantined. Even were the duty expressly imposed upon the Secretary to cause such

hearings to be had and adopt the necessary quarantine. measures, there could be no other or greater duty imposed upon this officer to ascertain the facts and adopt the proper regulations than was already imposed upon Congress itself before the law was enacted. We respectfully insist that no more imperative duty to pass needed legislation can be delegated to any officer, board or tribunal than already exists in the delegating legislative body itself, and failure on the part of Congress to act has never been held to imply a congressional finding that legislation of the several States was unnecessary. The · Secretary would not be required to fix quarantine lines if he deemed the state regulations sufficiently effective.

But the federal law does not, and was not intended to, cover the entire field of quarantining districts infested with injurious plant diseases and insect pests. It authorizes the Secretary of Agriculture to establish quarantine when he finds that any particular plant disease or insect infestation is "new to or *not theretofore widely prevalent or distributed within and throughout the United States.*" It might well be urged that in the present case, for instance, the alfalfa weevil was widely prevalent in the United States, since it exists in Utah, Colorado, Idaho, Oregon and Nevada, and for that reason the Secretary of Agriculture would be powerless to establish the quarantine provided for by the Act; and were the federal Act adjudged to be exclusive, the State of Washington, which is now free from the pest, would be powerless to prevent infestation of its 300,000 acres of alfalfa land by appropriate quarantine measures. Under the federal law it is apparent that, if all States save one were infected, the one free from infection would be powerless to protect itself. This could not have been the purpose of Congress in enacting this legislation. *Savage* v. *Jones,* 225 U. S. 501; *Carey* v. *South Dakota,* 250 U. S. 118; *Reid* v. *Colorado,* 187 U. S. 137; *Asbell* v. *Kansas,* 209 U. S. 251; *State* v.

*R. Co.,* 200 Mo. App. 109; *Missouri Pacific Ry.* v. *Larabee Mills,* 211 U. S. 612.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This was a bill of complaint filed by the State of Washington in the Superior Court of Thurston County of that State against the defendant, the Oregon-Washington Railway & Navigation Company, an interstate common carrier in the States of Idaho, Oregon and Washington. The bill averred that there existed in the areas of the States of Utah, Idaho, Wyoming, Oregon and Nevada, an injurious insect popularly called the alfalfa weevil, and scientifically known as the *Phytonomus posticus,* which fed upon the leaves and foliage of the alfalfa plant, to the great damage of the crop; that the insect multiplied rapidly and was propagated by means of eggs deposited by the female insect upon the leaves and stalks of the plant; that when the hay was cured, the eggs clung to and remained dormant upon the hay and even in the meal made from it; that the eggs and live weevils were likely to be carried to points where hay was transported, infecting the growing crop there; that when the hay was carried in common box cars the eggs and live weevils were likely to be shaken out and distributed along the route and communicated to the agricultural lands adjacent to the route; that a proper inspection to ascertain the presence of the eggs or weevils would require the tearing open of every bale of hay and sack of meal, involving a prohibitive cost of inspection, and that the only practical method of preventing the spread into uninfested districts was to prohibit the transportation of hay or meal from the district in which the weevil existed; that the pest is new to, and not generally distributed within, the State of Washington; that there is no known method of ridding an infested district of the pest; that subsequent to June 8, 1921, and

prior to September 17, 1921, information was received by
the Washington Director of Agriculture that there was a
probability of the introduction of the weevil into the State
across its boundaries; that he thereupon investigated
thoroughly the insect and the areas where such pests ex-
isted and ascertained it to be in the whole of the State of
Utah, all portions of the State of Idaho lying south of
Idaho County, the counties of Uinta and Lincoln in the
State of Wyoming, the county of Delta in the State of
Colorado, the counties of Malheur and Baker in the State
of Oregon, and the county of Washoe in the State of Ne-
vada; that he, with the approval of the Governor of the
State, thereupon, on or about September 17, 1921, made
and promulgated a quarantine regulation and order under
the terms of which he declared a quarantine against all of
the above described areas and forbade the importation
into Washington of alfalfa hay and alfalfa meal, except in
sealed containers, and fixed the boundaries of the quaran-
tine.   The bill further averred that the defendant, know-
ing of the proclamation, and in violation thereof, had
caused to be shipped into Washington, in common box
cars, and not in sealed containers, approximately 100 cars
of alfalfa hay, consigned from various points in the State
of Idaho lying south of Idaho County and through the
State of Oregon and into the State of Washington, in di-
rect violation of the quarantine order; and that, unless
enjoined, the defendant would continue to make these
shipments from such quarantined area in the State of
Idaho into and through the State of Washington; that
large quantities of alfalfa were grown in the eastern and
central portions of Washington and adjacent to the rail-
road lines of the defendant and other railroads over which
such shipments of alfalfa hay were shipped, and were likely
to be shipped in the future unless an injunction was
granted, to the great and irreparable damage of the citi-
zens of Washington growing alfalfa therein.   A tempo-

rary injunction was issued, and then a demurrer was filed by the defendants. The demurrer was overruled. An answer was filed and in each of the pleadings was set out the claim by the defendant that the action and proclamation of the Director of Agriculture and the Governor, and chapter 105 of the Laws of Washington of 1921, under which they acted, were in contravention of the interstate commerce clause of the Federal Constitution, and in conflict with an act of Congress.

At the hearing there was evidence on behalf of the State that the Oregon-Washington and Northern Pacific Railroads ran through the parts of the State where the alfalfa was raised; that the weevil had first appeared in Utah in 1904 in Salt Lake City, and that it had spread about 10 miles a year; that it came from Russia and Southern Europe; that it would be impossible to adopt any method of inspection of alfalfa hay to keep out the weevil not prohibitory in cost; that in Europe the weevil is not a serious pest, because its natural enemies exist there and they keep it down; that the United States Government had attempted to introduce parasites, but that it takes a long time to secure a natural check from such a method; that methods by using poison sprays, by burning and in other ways had been used to attack the pest, but that no one method has been entirely successful; that there is no practical way of eliminating the beetles completely if the field once becomes infected, and the continuance of the pest will be indefinite; that the great danger of spreading the infection is through the transfer of hay from one section to another. In behalf of the defendant it was testified that the prevalent opinion in regard to the spread of the alfalfa weevil and the damage it was doing was vastly exaggerated; that the spread of the weevil from hay shipped in the cars, through the State of Washington, was decidedly improbable. The Superior Court made the temporary injunction permanent and the

Supreme Court of Washington affirmed the decree. This
is a writ of error under section 237 of the Judicial Code
to that decree.

By chapter 105 of the Washington Session Laws of
1921, p. 308, the Director is given the power and duty,
with the approval of the Governor, to establish and main-
tain quarantine needed to keep out of the State contagion
or infestation by disease of trees and plants and injurious
insects or other pests, to institute an inspection to prevent
any infected articles from coming in except upon a cer-
tificate of investigation by such Director, or in his name
by an inspector. Upon information received by the Direc-
tor, of the existence of any infectious plant disease, insect
or weed pest, new to or not generally distributed within
the State, dangerous to the plant industry of the State, he
is required to proceed to investigate the same, and then
enforce necessary quarantine. There is a provision for •
punishment by a fine of not less than $100, or more than
$1,000, or by both such fine and imprisonment, for viola-
tion of the Act.

In the absence of any action taken by Congress on the
subject matter, it is well settled that a State in the exer-
cise of its police power may establish quarantines against
human beings or animals or plants, the coming in of which
may expose the inhabitants or the stock or the trees, plants
or growing crops to disease, injury or destruction thereby,
and this in spite of the fact that such quarantines neces-
sarily affect interstate commerce.

Chief Justice Marshall, in *Gibbons* v. *Ogden,* 9 Wheat.
1, speaking of inspection laws, says at p. 203:

" They form a portion of that immense mass of legis-
lation, which embraces everything within the territory of
a state, not surrendered to the general government: all ·
which can be most advantageously exercised by the states
themselves. Inspection laws, quarantine laws, health laws
of every description, as well as laws for regulating the in-

ternal commerce of a state, and those which respect turnpike roads, ferries, etc., are component parts of this mass."

Again, he says at p. 205:

" The acts of congress, passed in 1796 and 1799 (1 Stat. 474, 619), empowering and directing the officers of the general government to conform to, and assist in the execution of the quarantine and health laws of a state, proceed, it is said, upon the idea that these laws are constitutional. It is undoubtedly true, that they do proceed upon that idea; and the constitutionality of such laws has never, so far as we are informed, been denied. But they do not imply an acknowledgment that a state may rightfully regulate commerce with foreign nations, or among the states; for they do not imply that such laws are an exercise of that power, or enacted with a view to it. On the contrary, they are treated as quarantine and health laws, are so denominated in the acts of congress, and are considered as flowing from the acknowledged power of a state, to provide for the health of its citizens. But, as it was apparent that some of the provisions made for this purpose, and in virtue of this power, might interfere with, and be affected by the laws of the United States, made for the regulation of commerce, congress, in that spirit of harmony and conciliation, which ought always to characterize the conduct of governments standing in the relation which that of the Union and those of the states bear to each other, has directed its officers to aid in the execution of these laws; and has, in some measure, adapted its own legislation to this object, by making provisions in aid of those of the states. But, in making these provisions, the opinion is unequivocally manifested, that Congress may control the state laws, so far as it may be necessary to control them, for the regulation of commerce."

This Court in the *Minnesota Rate Cases,* 230 U. S. 352, 406, said:

"Quarantine regulations are essential measures of protection which the States are free to adopt when they do

not come into conflict with Federal action. In view of the need of conforming such measures to local conditions, Congress from the beginning has been content to leave the matter for the most part, notwithstanding its vast importance, to the States and has repeatedly acquiesced in the enforcement of State laws. . . . Such laws undoubtedly operate upon interstate and foreign commerce. They could not be effective otherwise. They cannot, of course, be made the cover for discriminations and arbitrary enactments having no reasonable relation to health (*Hannibal & St. Joseph Railroad Co.* v. *Husen,* 95 U. S. 465, 472, 473) ; but the power of the State to take steps to prevent the introduction or spread of disease, although interstate and foreign commerce are involved (subject to the paramount authority of Congress if it decides to assume control), is beyond question. *Morgan's &c. S. S. Co.* v. *Louisiana,* 118 U. S. 455; *Missouri, Kansas & Texas Ry. Co.* v. *Haber,* 169 U. S. 613; *Louisiana* v. *Texas,* 176 U. S. 1; *Rasmussen* v. *Idaho,* 181 U. S. 198; *Compagnie Francaise, etc.* v. *Board of Health,* 186 U. S. 380; *Reid* v. *Colorado,* 187 U. S. 137, 138; *Asbell* v. *Kansas,* 209 U. S. 251."

Counsel for the company argues that the case of *Railroad Co.* v. *Husen,* 95 U. S. 465, is an authority to show that this law as carried out by the proclamation goes too far, in that it forbids importations from certain parts of Idaho, of Utah, of Nevada, of alfalfa hay, without qualification and without any limit of time. The *Husen Case* is to be distinguished from the other cases cited, in that the Missouri statute there held invalid was found by the Court not to be a quarantine provision at all. It forbade the importation into Missouri for eight months of the year of any Texas, Mexican or Indian cattle without regard to whether the cattle were diseased or not, and without regard to the question whether they came from a part of the country where they had been exposed to contagion.

We think that here the investigation required by the Washington law and the investigation actually made into the existence of this pest and its geographical location makes the law a real quarantine law, and not a mere inhibition against importation of alfalfa from a large part of the country without regard to the conditions which might make its importation dangerous.

The second objection to the validity of this Washington law and the action of the State officers, however, is more formidable.    Under the language used in *Gibbons v. Ogden, supra,* and the *Minnesota Rate Cases, supra,* the exercise of the police power of quarantine, in spite of its interfering with interstate commerce, is permissible under the Interstate Commerce clause of the Federal Constitution " subject to the paramount authority of Congress if it decides to assume control."

By the Act of Congress of August 20, 1912, 37 Stat. 315, c. 308, as amended by the Act of March 4, 1917, 39 Stat. 1165, c. 179, it is made unlawful to import or offer for entry into the United States, any nursery stock unless permit had been issued by the Secretary of Agriculture under regulations prescribed by him.

Section 2 makes it the duty of the Secretary of the Treasury to notify the Secretary of Agriculture of the arrival of any nursery stock and forbids the shipment from one State or Territory or District of the United States into another of any nursery stock imported into the United States without notifying the Secretary of Agriculture, or at his direction, the proper State, Territorial or District official to which the nursery stock was destined.   Whenever the Secretary of Agriculture shall determine that such nursery stock may result in the entry of plant diseases or insect pests, he shall promulgate his determination of this, but shall give due notice and a public hearing at which any interested party may appear before the promulgation.

Section 7 provides that whenever, in order to prevent the introduction into the United States of any tree, plant or fruit disease, or any injurious insect, not theretofore widely prevalent or distributed within and through the United States, the Secretary shall determine that it is necessary to forbid the importation into the United States, he shall promulgate such determination, and such importations are thereafter prohibited.

Section 8 of the Act was amended by the Agricultural Appropriation Act of March 4, 1917, and reads as follows:

" Sec. 8. That the Secretary of Agriculture is authorized and directed to quarantine any State, Territory, or District of the United States, or any portion thereof, when he shall determine that such quarantine is necessary to prevent the spread of a dangerous plant disease or insect infestation, new to or not theretofore widely prevalent or distributed within and throughout the United States; and the Secretary of Agriculture is directed to give notice of the establishment of such quarantine to common carriers doing business in or through such quarantined area, and shall publish in such newspapers in the quarantined area as he shall select notice of the establishment of quarantine. That no person shall ship or offer for shipment to any common carrier, nor shall any common carrier receive for transportation or transport, nor shall any person carry or transport from any quarantined State or Territory or District of the United States, or from any quarantined portion thereof, into or through any other State or Territory or District, any class of nursery stock or any other class of plants, fruits, vegetables, roots, bulbs, seeds, or other plant products, or any class of stone or quarry products, or any other article of any character whatsoever, capable of carrying any dangerous plant disease or insect infestation, specified in the notice of quarantine except as hereinafter provided. That it shall be unlawful to

100569°—26——7

move, or allow to be moved, any class of nursery stock or any other class of plants, fruits, vegetables, roots, bulbs, seeds, or other plant products, or any class of stone or quarry products, or any other article of any character whatsoever, capable of carrying any dangerous plant disease or·insect infestation, specified in the notice of quarantine hereinbefore provided, and regardless of the use for which the same is intended, from any quarantined State or Territory or District of the United States or quarantined portion thereof, into or through any other State or Territory or District, in manner or method or under conditions other than those prescribed by the Secretary of Agriculture. That it shall be the duty of the Secretary of Agriculture, when the public interests will permit, to make and promulgate rules and regulations which shall permit and govern the inspection, disinfection, certification, and method and manner of delivery and shipment of the class of nursery stock or·of any other class of plants, fruits, vegetables, roots, bulbs, seeds, or other plant products, or·any·class of stone or quarry products, or any other article of any character whatsoever, capable of carrying any dangerous plant disease or insect infestation, specified in the notice of quarantine hereinbefore provided, and regardless of·the use for which the same is intended, from a quarantined State or Territory or District of the United States, or quarantined portion thereof, into or through any other State or Territory or District; and the Secretary of Agriculture shall give notice of such rules and regulations as hereinbefore provided in this section for the notice of the establishment of quarantine: *Provided,* That before the Secretary of Agriculture shall promulgate his determination that it is necessary to quarantine any State, Territory, or District of the United States, or portion thereof, under the authority given in this section, he shall, after due notice to interested parties, give a public hearing under such rules and regulations

as he shall prescribe, at which hearing any interested party may appear and be heard, either in person or by attorney."

Section 10 of the Act provides that any person who shall violate any provisions of the Act, or who shall forge, counterfeit or destroy any certificate provided for in the Act or in the regulations of the Secretary of Agriculture, shall be deemed guilty of a misdemeanor and shall, upon conviction thereof, be punished by a fine not exceeding $500 or by imprisonment not exceeding one year, or both such fine and imprisonment, in the discretion of the court. It is made the duty of the United States attorneys diligently to prosecute any violations of this Act which are brought to their attention by the Secretary of Agriculture, or which come to their notice by other means; and for the purpose of carrying out the provisions of the Act, the Secretary of Agriculture shall appoint from existing bureaus in his office, a commission of five members employed therein.

It is impossible to read this statute and consider its scope without attributing to Congress the intention to take over to the Agricultural Department of the Federal Government the care of the horticulture and agriculture of the States, so far as these may be affected injuriously by the transportation in foreign and interstate commerce of anything which by reason of its character can convey disease to and injure trees, plants or crops. All the sections look to a complete provision for quarantine against importation into the country and quarantine as between the States under the direction and supervision of the Secretary of Agriculture.

The courts of Washington and the counsel for the State rely on the decision of this Court in *Reid* v. *Colorado,* 187 U. S. 137, as an authority to sustain the validity of the Washington law before us. The *Reid Case* involved the constitutionality of a conviction of Reid for violation of

an Act of Colorado to prevent the introduction of infectious or contagious diseases among the cattle and horses of that State. The law made it unlawful for any person, association or corporation to bring or drive any cattle or horses, suffering from such disease, or which had within ninety days prior thereto been herded or brought into contact with any other cattle or horses, suffering from such disease, into the State, unless a certificate or bill of health could be produced from the state veterinary sanitary board that the cattle and horses were free from all infectious or contagious diseases. It was urged that it was inconsistent with the Federal Animal Industry Act. This directed a study of contagious and communicable diseases of animals and the best method of treating them, by the Federal Commissioner of Agriculture, to be certified to the executive authority of each State, and the coöperation of such authority was invited. If the authorities of the State adopted the plans and methods advised by the Department, or if such authorities adopted measures of their own which the Department approved, then the money appropriated by Congress was to be used in conducting investigations and in aiding such disinfection and quarantine measures as might be necessary to prevent the spread of the diseases in question from one State or Territory into another. This Court held that Congress did not intend by the Act to override the power of the States to care for the safety of the property of their people, because it did not undertake to invest any officer or agent of the Department with authority to go into a State and without its assent take charge of the work of suppressing or extirpating contagious, infectious or communicable diseases there prevailing, or to inspect cattle or give a certificate of freedom from disease for cattle, of superior authority to state certificates.

It is evident that the federal statute under consideration in the *Reid Case* was an effort to induce the States to

coöperate with the general Government in measures to suppress the spread of disease without at all interfering with the action of the State in quarantining or taking any other measures to extirpate it or prevent its spread. Indeed the Commissioner of Agriculture in that case was to aid the state authorities in their quarantine and other measures from federal appropriation. The act we are considering is very different. It makes no reference whatever to coöperation with state authorities. It proposes the independent exercise of federal authority with reference to quarantine in interstate commerce. It covers the whole field so far as the spread of the plant disease by interstate transportation can be affected and restrained. With such authority vested in the Secretary of Agriculture, and with such duty imposed upon him, the state laws of quarantine that affect interstate commerce and this federal law can not stand together. The relief sought to protect the different States, in so far as it depends on the regulation of interstate commerce, must be obtained through application to the Secretary of Agriculture.

In the relation of the States to the regulation of interstate commerce by Congress there are two fields. There is one in which the State can not interfere at all, even in the silence of Congress. In the other, (and this is the one in which the legitimate exercise of the State's police power brings it into contact with interstate commerce so as to affect that commerce,) the State may exercise its police power until Congress has by affirmative legislation occupied the field by regulating interstate commerce and so necessarily has excluded state action.

Cases of the latter type are the *Southern Railway Co.* v. *Reid,* 222 U. S. 424; *Northern Pacific Railway Co.* v. *Washington,* 222 U. S. 370, 378; *C. R. I. & P. Ry. Co.* v. *Elevator Company,* 226 U. S. 426, 435; *Erie Railroad Co.* v. *New York,* 233 U. S. 671, 681; and *Missouri Pacific Railroad Co.* v. *Stroud,* 267 U. S. 404.

Some stress is laid by the counsel of the State on the case of *Missouri Pacific Ry. Co.* v. *Larabee Flour Mills*, 211 U. S. 612. There the question was whether a state court might by mandamus compel a railroad company, under its common law obligation as a common carrier, to afford equal local switching service to its shippers, notwithstanding the fact that the cars in regard to which the service was claimed were two-thirds of them in interstate commerce and one-third in intrastate commerce. The contention was that the enactment of the Interstate Commerce Law put such switching wholly in control of the Interstate Commerce Commission. The case was one on the border line, three judges dissenting. The number of cases decided since that case and above cited have made it clear that the rule, as it always had been, was not intended in that case to be departed from. That rule is that there is a field in which the local interests of States touch so closely upon interstate commerce that, in the silence of Congress on the subject, the States may exercise their police powers; and local switchings, as in that case, and quarantine, as in the case before us, are in that field. But when Congress has acted and occupied the field, as it has here, the power of the States to act is prevented or suspended.

It follows that, pending the existing legislation of Congress as to quarantine of diseased trees and plants in interstate commerce, the statute of Washington on the subject can not be given application. It is suggested that the States may act in the absence of any action by the Secretary of Agriculture; that it is left to him to allow the States to quarantine, and that if he does not act there is no invalidity in the state action. Such construction as that can not be given to the federal statute. The obligation to act without respect to the States is put directly upon the Secretary of Agriculture whenever quarantine, in his judgment, is necessary. When he does not

act, it must be presumed that it is not necessary. With the federal law in force, state action is illegal and unwarranted.

The decree of the Supreme Court of Washington is

*Reversed.*

MR. JUSTICE MCREYNOLDS and MR. JUSTICE SUTHERLAND, dissenting.

We cannot think Congress intended that the Act of March 4, 1917, without more should deprive the States of power to protect themselves against threatened disaster like the one disclosed by this record.

If the Secretary of Agriculture had taken some affirmative action the problem would be a very different one. Congress could have exerted all the power which this statute delegated to him by positive and direct enactment. If it had said nothing whatever, certainly the State could have resorted to the quarantine; and this same right, we think, should be recognized when its agent has done nothing.

It is a serious thing to paralyze the efforts of a State to protect her people against impending calamity and leave them to the slow charity of a far-off and perhaps supine federal bureau. No such purpose should be attributed to Congress unless indicated beyond reasonable doubt.