UNITED STATES v. EDWARDS.

No. 866–Y.

District Court, S. D. California, Central Division.

April 4, 1936.

Peirson M. Hall, U. S. Atty., and Clyde Thomas and Hal Hughes, Asst. U. S. Attys., all of Los Angeles, Cal.

E. V. Knauff, of Los Angeles, Cal., and Henry Wenzlaff, of San Bernardino, Cal., for defendant.

YANKWICH, District Judge.

The controversy centers around certain provisions of the Agricultural Adjustment Act of 1933 as amended in 1935 (7 U.S. C.A. § 601 et seq.) relating to the control by the Secretary of Agriculture of the marketing of products in interstate commerce, with or without marketing agreements. They are too lengthy to be set out in full. However, the discussion of the problems involved calls for their general outline.

The act declares, in its preamble, an acute emergency to exist. The cause it declares to be the disparity "between the prices of agricultural and other commodities, which disparity has largely destroyed the purchasing power of farmers for industrial products, has broken down the orderly exchange of commodities, and has seriously impaired the agricultural assets supporting the national credit structure." These conditions have "burdened and obstructed the normal currents of commerce in such commodities," making the enactment of the legislation imperative. 7 U. S.C.A. § 601. In view of these conditions, it is declared to be the policy of the Congress to establish and maintain such balance between the production and consumption of agricultural commodities and *such marketing conditions therefor* "as will re-establish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period." The base period, in the case of all agricultural commodities except tobacco and potatoes, is declared to be the pre-war period August, 1909, to July, 1914. 7 U.S.C.A. § 602. One of the methods provided for effectuating the declared purpose of the Congress is by means of marketing agreements with various persons engaged in the handling of any commodity or product thereof. 7 U. S.C.A. § 608b. From time to time, the Secretary of Agriculture is authorized to issue orders applicable to various persons, including associations of producers and others engaged in the handling of agricultural commodities. They are denominated "handlers." The orders must regulate the manner of handling of such agricultural commodities or products as are in the current of interstate or foreign commerce or which directly burden, obstruct, or affect interstate commerce in such commodity or product. Among the commodities affected are fruits, with certain exceptions. Whenever the Secretary has reason to believe that an order is necessary to effect the policy of the act with respect to any commodity, he must give notice for a hearing upon the proposed order. If, after such hearing, he finds that the order will carry into effect the declared policy of the act, he issues the order. 7 U.S.C.A. § 608c (1, 4). Orders relating to fruits must contain limitations of the total quantity of any commodity or product produced within a certain period which may be marketed in or transported to any or all markets in interstate commerce during any period by the handlers thereof; or allotment of the amount which any handler may purchase from or handle during any specified period or periods in interstate

commerce; or allotment of the commodity or produce which each handler may market in or transport to any or all markets in the currents of interstate commerce; or determination of the surplus of any such commodity, the establishment of means of eliminating the surplus, and the establishment of reserve pools. The orders must also contain one or more of the following terms and conditions: Prohibiting unfair methods of competition and unfair trade practices in the handling thereof, providing that the commodities shall be handled by all handlers at a price fixed by all, providing for the selection by the Secretary of an agency for the administration of the order—and other conditions necessary to carry into effect the provisions as to limiting, allotting, et cetera. No order issued under the provisions relating to marketing is effective until the handlers of not less than 50 per cent. of the volume of the commodity or product so marketed have signed a marketing agreement under the provisions of the act. As to California citrus fruits, the marketing agreement is not effective until the handlers of not less than 80 per cent. of the volume of such commodity or product have signed the agreement. The issuance of such order must be approved by at least two-thirds of the producers in all localities except California, where, in the case of citrus fruits, it must be approved by three-fourths of the producers. 7 U.S.C.A. § 608c(7, 8). The order may be issued either with or without a marketing agreement. 7 U.S.C.A. § 608c(9, 10). The orders are to be regional unless the Secretary finds, as to a particular commodity or product, that orders made applicable to regional areas would not carry into effect the object of the act. 7 U.S.C.A. § 608c(11). The approval or disapproval of producers may be expressed through their co-operative associations. 7 U.S.C.A. § 608c(12). No order applies to any person who sells agricultural commodities or products at retail (with certain exceptions), nor to producers as such. 7 U.S.C.A. § 608c (13). The violation of an order is made an offense. 7 U.S.C.A. § 608c(14). A handler has the right to be heard by the Secretary in opposition to any order made. The ruling of the Secretary on the matter is subject to review by the various *district courts of the United States.* 7 U.S.C.A. § 608c(15). Orders of the Secretary may be terminated or suspended by him whenever he finds that the order obstructs or fails to effectuate the policy of the act. He may also terminate any marketing agreement, if he finds that such termination is favored by the majority of the producers who during a representative period have been engaged in the production for market of the commodity specified in the agreement or order. 7 U.S.C.A. § 608c(16). The parties to marketing agreements and handlers are required to furnish the Secretary with information relating to the manner in which the agreement has been carried out. The information is kept confidential. 7 U.S.C.A. § 608d. If the base period, or a portion of it, specified in the act cannot be determined from the available statistics of the Department of Agriculture, the post-war period, August, 1919, to July, 1929, governs. 7 U.S.C.A. § 608e. The Secretary is authorized to establish state and local committees or associations of producers to act as agents of their members in connection with the provisions of the act. The orders issued by the Secretary must require a prorating of the expenses of administration by the agency among the handlers. 7 U.S.C.A. § 610. Certain rights and powers of the Federal Trade Commission Act approved September 26, 1914 (15 U.S.C.A. §§ 41–51), are made applicable to the Secretary in the administration of the act. And he is authorized to confer, with state authorities, at their request, as to methods of administration aiming at uniformity and he may, with the consent of state authorities, use such state employees or local officers as may be necessary. 7 U.S.C.A. § 610.

The amendments of August 24, 1935, continued in effect the marketing agreements entered into under the provisions of the act of 1933.

The action was instituted under the direct authority of subdivision 6 of section 8a of the act (7 U.S.C.A. § 608a(6), which gives the District Courts jurisdiction to enforce the provisions of the section and to prevent and restrain the violation of any of its provisions or of any orders or agreements entered under it. The act also authorizes the several United States attorneys of the United States, under the direction of the Attorney General, to institute appropriate proceedings. 7 U.S.C.A. § 608a(7).

The bill of complaint recites the following facts:

The defendant is a citizen of California, engaged in business under the name of Edwards Fruit Company at Colton, County of San Bernardino. In accordance with the provisions of the Agricultural Adjustment Administration General Regulations, Series A, No. 1, the Secretary of Agriculture, on September 24, 1935, gave to all interested persons, including the defendant, notice of a hearing to be held in Los Angeles, Cal., on October 9, 1935, with respect to a proposed order regulating the handling of oranges and grapefruit in the state of California and Arizona. From the evidence introduced at the hearing, the Secretary determined that an order regulating the handling of oranges and grapefruit would tend to improve the marketing conditions in the handling of these fruits in interstate and foreign commerce, and to effectuate the policy of the act. Accordingly, he issued an order on January 4, 1936, making a finding to that effect. The order became effective on January 13, 1936, and is still in effect. The order is applicable to shippers of oranges and grapefruit in the states of California and Arizona. It regulates the handling of such oranges and grapefruit in the same manner as the previous marketing agreement executed by the Secretary on December 14, 1933, after a public hearing. The parties signatory to the agreement were the shippers who handle more than 80 per cent. of the oranges and grapefruit shipped annually in the current of interstate and foreign commerce. The order designated members of a Growers' Advisory Committee and members of a Distribution Committee to be known jointly as the California-Arizona Orange Grapefruit Agency. The Secretary, upon the basis of the recommendation of the California-Arizona Orange Grapefruit Agency and other available information, established, on January 26, 1936, certain prorate districts for the purpose of allotting shipments of oranges and grapefruit. He also fixed—for weekly proration periods beginning respectively on February 2, February 9, February 16, and February 23, 1936—the quantity of oranges for shipment in interstate commerce and to Canada from California and Arizona, as well as the prorate bases of shippers who applied for allotments and a prorate base for the purpose of making such shipments. He also fixed the allotment of the quantity of oranges to be shipped by each of such shippers.

The defendant is a shipper. He has failed to comply with the provisions of the order and declines to do so. He has declined to apply for allotments and a prorate base covering his shipments in interstate commerce.

In addition to the facts just outlined, the bill, and the affidavits filed in support of the granting of an interlocutory injunction, set forth the importance of the orange and grapefruit crop as the second most important fruit crop in the United States. It is estimated that of the 50,000 growers engaged in commercial production of these two fruits, 18,000 are located in California and Arizona. The value of the product is great, and its decline, at times, has been in excess of 50 per cent. The market for oranges and grapefruit is predominately interstate. Ninety per cent. of the production in the two states moves in interstate commerce. Because of this, proper marketing is essential to prevent the further demoralization of the industry. The marketing will be demoralized if persons like the defendant are permitted to ship in interstate commerce in violation of the rules.

The facts relating to the defendant's shipments are not in dispute. The only issue presented by the affidavits of the defendant is his opinion that no prorating for marketing purposes is necessary and that his shipments are not so numerous as to endanger any market control. A temporary restraining order was issued.

The facts stated would justify the issuing of an injunction, if the marketing provisions of the Agricultural Adjustment Act and the orders made under them—with the violation of which the defendant is charged—are valid.

It is the contention of the defendant that *they are not*.

At the outset we are met with the contention that the decision of the Supreme Court in United States v. Butler (1935) 297 U.S. 1, 56 S.Ct. 312, 314, 80 L. Ed. ——, has invalidated the entire Agricultural Adjustment Act. A study of the opinion in that case shows that the only matter decided was the validity of the processing tax in its relation to the scheme of crop control to which the proceeds of the tax were devoted. Without denying to the Congress the power to levy a processing tax, but rather conceding it (as the dissenting opinion of Mr.

Justice Stone emphasizes, 297 U.S. 79, 56 S.Ct. 324, 80 L.Ed. —), the Supreme Court denied validity to the particular processing tax because it was tied to a scheme of intrastate agricultural control which the court thought beyond the power of the Congress. The only two features of the Agricultural Adjustment Act which the court had before it were the processing tax and the control of production through the use of the tax. That the court dealt only with certain (*not with all the*) provisions of the Agricultural Adjustment Act is evident from the first paragraph of the majority opinion, which reads: "In this case we must determine *whether certain provisions* of the Agricultural Adjustment Act, 1933, *conflict* with the Federal Constitution." (Italics added.)

Were these provisions the only constituent part of the act, the argument might have force. But they are not. The act is multifarious, and many *other* features, which were not involved in the decision in United States v. Butler, supra, are contained in it. These features are distinct, separable portions of the act. Their validity is not impaired by the decision.

Their purpose is to regulate market conditions in agricultural products by the use of the authority to regulate commerce. They are a distinct part of the act unconnected with the portions declared invalid in United States v. Butler, supra. These portions are clearly separable both under the separability clause of the act (7 U.S.C.A. § 614) and upon principle. See Berea College v. Kentucky (1908) 211 U.S. 45, 29 S.Ct. 33, 53 L.Ed. 81; Carey v. South Dakota (1919) 250 U.S. 118, 39 S.Ct. 403, 63 L.Ed. 886; Dorchy v. Kansas (1924) 264 U.S. 286, 44 S.Ct. 323, 68 L.Ed. 686; Champlin Refining Co. v. Corporation Commission (1932) 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403. For they constitute a complete scheme which can be given effect after the processing and the control-of-production features of the act are completely eliminated. And this fact has always been considered a determinant test in saving the valid portions of a statute from those that were invalid.

We are thus brought to the consideration of a more fundamental question: Is the attempted control of marketing through the exercise of the commerce clause valid?

■ By clause 3, section 8, article 1 of the Constitution of the United States, the Congress is given power "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

In Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks (1930) 281 U. S. 548, 570, 50 S.Ct. 427, 433, 74 L.Ed. 1034, the extent of this power is thus given: "The power to regulate commerce is the power to enact 'all appropriate legislation' for its *'protection or advancement'* (The Daniel Ball, 10 Wall. 557, 564, 19 L.Ed. 999); to adopt measures *'to promote its growth and insure its safety'* (County of Mobile v. Kimball, 102 U.S. 691, 696, 697, 26 L.Ed. 238); to *'foster, protect, control,* and *restrain'* (Second Employers' Liability Cases, 223 U.S. 1, 47, 32 S.Ct. 169, 174, 56 L.Ed. 327, 38 L.R. A.(N.S.) 44." (Italics added.) Ever since the decision in Gibbons v. Ogden (1824) 9 Wheat. 1, 196, 6 L.Ed. 23, the power of the Congress in this respect has been considered plenary. Mr. Chief Justice Marshall in that case asked the question: "What is this power?" And he answered: "It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, *is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations,* other than are prescribed in the constitution. These are expressed in plain terms, and do not affect the questions which arise in this case, or which have been discussed at the bar. If, as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several states, is vested in Congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States. The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied, to secure them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments." Gibbons v. Ogden, supra, 9

Wheat. 1, 196, 6 L.Ed. 23, at page 70. (Italics added.) In the same opinion Mr. Chief Justice Marshall insisted that commerce should not be defined as traffic and limited to buying and selling, or the interchange of commodities. "This," he said, "would restrict a general term, applicable to many objects, to one of its significations. Commerce, undoubtedly, is traffic, but it is something more—*it is intercourse*. It describes the commercial intercourse between nations, and parts of .nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." Gibbons v. Ogden, supra, 9 Wheat. 1, 189, 6 L.Ed. 23, at page 68. (Italics added.) In Board of Trustees of University of Illinois v. United States (1933) 289 U.S. 48, 53 S.Ct. 509, 77 L.Ed. 1025, Mr. Chief Justice Hughes says of the power to regulate commerce: "It is an essential attribute of the power that it is *exclusive* and *plenary*. As an exclusive power, its exercise may not be limited, qualified, or impeded to any extent by state action" (Italics added.)

In the exercise of this power the Congress may exercise powers akin to the police power within the field of interstate commerce.

The principle was thus stated by Mr. Chief Justice Taft in Brooks v. United States (1925) 267 U.S. 432, 436, 45 S.Ct. 345, 346, 69 L.Ed. 699, 37 A.L.R. 1407, in upholding the statute forbidding the transportation of stolen automobiles in interstate commerce: "Congress can certainly regulate interstate commerce to the extent of forbidding and punishing the use of such commerce as an agency to promote immorality, dishonesty or *the spread of any evil or harm to the people of other states from the State of origin*. In doing this it is merely exercising the police power, for the benefit of the public, within the field of interstate commerce." (Italics added.) This case, and others to be referred to, hold distinctly that regulation may take the form of prohibition.

In United States v. Hill (1919) 248 U. S. 420, 427, 39 S.Ct. 143, 145, 63 L.Ed. 337, the court, in upholding the act of Congress which prohibited the transportation of liquor into states having prohibition laws, said that the power to regulate commerce *"may take the character of prohibition, in proper cases."*

Federal legislation is replete with instances of the exercise of this power so as to prohibit the transportation of things and persons within interstate commerce. A few of them may be here given in the order of their enactment over a period of forty years.

The Wilson Act of 1890, subjecting to state laws liquors in interstate commerce upon their arrival in the state, sustained in Re Rahrer (1891) 140 U.S. 545, 11 S.Ct. 865, 35 L.Ed. 572.

The Anti-Lottery Act of 1895 (18 U.S. C.A. § 387), prohibiting the transportation of lottery tickets in interstate commerce, sustained in Champion v. Ames (1903) 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492.

The Lacey Act of 1900 (18 U.S.C.A. §§ 391–395), prohibiting the shipment and transportation in interstate commerce of game killed in violation of local laws, sustained in Rupert v. United States (C.C.A. 8th Cir.,1910) 181 F. 87.

The Hepburn Act of 1906 (49 U.S.C.A. § 1(8), prohibiting the transportation by railroads of certain commodities when those commodities have been manufactured, mined, or produced by the railroads or the railroads owned them, sustained in United States v. Delaware & Hudson Co. (1909) 213 U.S. 366, 29 S.Ct. 527, 53 L.Ed. 836.

The Pure Food and Drug Act of 1906 (21 U.S.C.A. §§ 1, 3), excluding from interstate transportation foods and drugs not inspected or labeled in accordance with the act, sustained in Hipolite Egg Co. v. United States (1911) 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364, and McDermott v. Wisconsin (1913) 228 U.S. 115, 33 S.Ct. 431, 57 L.Ed. 754, 47 L.R.A.(N.S.) 984, Ann.Cas.1915A, 39.

The Mann Act of 1910 (18 U.S.C.A. §§ 397–404), prohibiting the transportation of women for immoral purposes, sustained in Hoke v. United States (1913) 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523, 43 L.R.A. (N.S.) 906, Ann.Cas.1913E, 905; Bennett v. United States (1913) 227 U.S. 333, 33 S.Ct. 288, 57 L.Ed. 531; Harris v. United States (1913) 227 U.S. 340, 33 S.Ct. 289, 57 L.Ed. 534; Caminetti v. United States (1917) 242 U.S. 470, 37 S.Ct. 192, 197, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas. 1917B, 1168. In Caminetti v. United States, supra, the court said: "The authority of Congress to keep the channels of interstate commerce free from immoral and *in-*

*jurious* uses has been frequently sustained, and is no longer open to question." (Italics added.)

The act of 1912 prohibiting the transportation of prize fight pictures (18 U.S. C.A. § 405), sustained in Weber v. Freed (1915) 239 U.S. 325, 36 S.Ct. 131, 60 L.Ed. 308, Ann.Cas.1916C, 317.

The Webb-Kenyon Act of 1913 (c. 90, 37 Stat. 699 [27 U.S.C.A. § 122]), prohibiting shipment of intoxicants into a prohibition state to be used there in violation of its law, sustained in Clark Distilling Co. v. Western Maryland Railroad Co. (1917) 242 U.S. 311, 37 S.Ct. 180, 61 L. Ed. 326, L.R.A.1917B, 1218, Ann.Cas. 1917B, 845.

The Grain Standards Act of 1916 (7 U.S.C.A. § 71 et seq.), which the Supreme Court in Shafer v. Farmers' Grain Co. (1925) 268 U.S. 189, 45 S.Ct. 481, 69 L.Ed. 909, held to be so exclusive within the field of establishing standards for grain as to invalidate any state legislation, even in aid of it.

The Federal Quarantine Act of 1917 (7 U.S.C.A. § 161), excluding diseased plants and shrubs, from an infected area, sustained in Oregon-Washington R. & Nav. Co. v. State of Washington (1926) 270 U.S. 87, 46 S.Ct. 279, 70 L.Ed. 482.

The Dyer Motor Vehicle Theft Act of 1919 (18 U.S.C.A. § 408), prohibiting the transportation of stolen automobiles in interstate commerce, sustained in Brooks v. United States, supra.

The Grain Futures Act of 1922 (7 U.S. C.A. § 1 et seq.), aiming to regulate gambling in grains on the Chicago Board of Trade, sustained in Board of Trade of Chicago v. Olsen (1923) 262 U.S. 1, 4, 43 S.Ct. 470, 67 L.Ed. 839.

The Hawes-Cooper Act of 1929 (49 U.S.C.A. § 60), subjecting prison-made goods to the laws of the state into which they are transported, sustained in State v. Whitfield (1934) 216 Wis. 577, 257 N.W. 601, and Whitfield v. Ohio, 56 S.Ct. 532, 80 L.Ed. ——.

The so-called "Lindbergh" Anti-Kidnapping Act of June, 1932 (see 18 U.S. C.A. § 408a), prohibiting the transportation of kidnapped persons across state lines, sustained in Kelly v. United States (C.C.A.10, 1935) 76 F.(2d) 847; Bailey v. United States (C.C.A.10, 1934) 74 F.(2d) 451; and in Gooch v. United States (1936) 56 S.Ct. 395, 80 L.Ed. ——.

We also have various statutes regulating interstate commerce rates and prohibiting monopolies and trusts, invariably sustained in Northern Securities Co. v. United States (1904) 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679, Houston, East & West Texas Ry. Co. v. United States (1914) 234 U.S. 342, 343, 34 S.Ct. 833, 58 L.Ed. 1341, Standard Oil Co. v. United States (1911) 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.(N.S.) 834, Ann.Cas.1912D, 734, as well as restrictions in our immigration laws. Head Money Cases (1884) 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798; Commissioner of Immigration v. Gottlieb (1924) 265 U.S. 310, 44 S.Ct. 528, 68 L.Ed. 1031.

In upholding these laws the courts have postulated the broadness of the commerce power.

Thus Mr. Justice Brandeis in Hamilton v. Kentucky Distilleries & Warehouse Co. (1919) 251 U.S. 146, 156, 40 S.Ct. 106, 108, 64 L.Ed. 194, in upholding wartime prohibition (chapter 212, 40 Stat. 1045), said: "That the United States lacks the police power, and that this was reserved to the states by the Tenth Amendment, is true. But it is none the less true that when the United States exerts any of the powers conferred upon it by the Constitution, no valid objection can be based upon the fact that such *exercise may be attended by the same incidents which attend the exercise by a state of its police power, or that it may tend to accomplish a similar purpose.*" (Italics added.)

It is the general view of writers that in these decisions is found the authority of the Congress, under the commerce clause, to prohibit commerce entirely. See Edward S. Corwin, "Congress's Power to Prohibit Commerce" (1933) 18 Cornell Law Quarterly, 477; Theodore W. Cousens, "The Use of the Federal Interstate Commerce Power to Regulate Matters within the States," (1934) 21 Virginia Law Review, 51; Thomas Reed Powell, "Commerce, Pensions, and Codes," (1935) Harvard Law Review 1, 195; and see, also, 2 Willoughby on The Constitution (2d Ed., 1929) §§ 575 to 592-a. If, as Mr. Chief Justice Taft stated in Brooks v. United States, supra, the commerce clause may be used to prevent the spread of "any evil or harm" coming to a state through persons or commodities of another state, it is difficult to understand why, in order to prevent the "glutting" of markets by agricultural products that cannot be sold (a

"glutting" which could result only in demoralizing the commerce in these commodities), the Congress cannot exclude from interstate commerce a certain number of commodities over and above a quota established (with the consent of a majority of the producers) after an inquiry into the needs for a particular time. It is hard to see why constitutional validity should be denied to such a procedure and granted in the case of lottery tickets, stolen automobiles, grains that do not conform to standards, or the right be recognized in the interstate commerce commission, as was done in Assigned Car Cases (1927) 274 U.S. 564, 47 S.Ct. 727, 71 L.Ed. 1204, to limit the quantities of railroad cars to be used in conjunction with certain industries, even to the extent of holding that the Congress could exclude private cars altogether from interstate railroads.

The decision in the Child Labor Case, Hammer v. Dagenhart (1918) 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724, if interpreted in the light of later cases, such as Brooks v. United States, supra, does not stand in the way. The majority of the court were satisfied that the main object there had been to interfere with the internal affairs of states, by compelling a change in the employment of children, under the guise of the exercise of the commerce power. .

■ From the exercise of the power to regulate commerce between states, incidental regulation or interference with intrastate activities may result. But the result so achieved does not invalidate it. In the matter of railroad rates, the Supreme Court has distinctly upheld interstate regulation of rates, even though their effect was to destroy valid intrastate rates. See Minnesota Rate Cases (1913) 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.(N.S.) 1151, Ann.Cas.1916A, 18. This upon the theory expressed in Railroad Commission of Wisconsin v. Chicago, B. & Q. R. Co. (1922) 257 U.S. 563, 588, 42 S.Ct. 232, 237, 66 L.Ed. 371, 22 A.L.R. 1086, that: "Commerce is a unit and does not regard state lines, and while under the Constitution, interstate and intrastate commerce are ordinarily subject to regulation by different sovereignties, yet when they are so mingled together that the supreme authority, the Nation, cannot exercise complete effective control over interstate commerce without incidental regulation of intrastate commerce, *such incidental regulation is not an invasion of state authority or a violation of the proviso.*" (Italics added.)

■ The regulation of interstate commerce here is not a regulation of production. It does not aim to control the amount of commodities to be produced in a particular state. It merely regulates the quantity to be shipped in interstate commerce. Admit that the object is to aid agriculture by securing a better price, that object is no more unconstitutional than the attempt to establish grain standards, or the attempt to aid agriculture, through the regulation of gambling of grain speculators whose activities may endanger the price of agricultural commodities.

Farm products not shipped in interstate commerce may be used or sold locally or transformed into other commodities. At best, the result to be attained is incidental to the exercise of the power. And where the power exists, the fact that the manner of its exercise may result in an incidental regulation of intrastate activity has not led courts to deny validity to its exercise. Thus to speak of something which concerns us all in the West, the power of the government to build Boulder Dam was sustained under the commerce clause (Const.art. 1, § 8) and upon the ground that the act of the Congress (43 U.S.C.A. §§ 617–617t) for its creation was passed "for river regulation, improvement of navigation, and flood control." See Arizona v. California (1931) 283 U.S. 423, 51 S.Ct. 522, 526, 75 L.Ed. 1154. This avowed purpose was attacked as being "a mere subterfuge and false pretense." But the court declined to go into the motives which had induced the members of the Congress to enact the act. And this, despite the fact that every school boy in the Southwest knows that one of the great aims was to preserve the flood waters of the Colorado for domestic and other uses of the great Southwest and to develop power for a growing community.

We conclude that if the power can be used to achieve beneficial results which may be called of a moral character, such as the exclusion of narcotics, liquors, lottery tickets, prize fight films, immoral persons, fruits and grain below a certain standard, from interstate commerce, when their use is incidental to the plenary control of the Congress over commerce between the states, an act which seeks to limit the shipment of the products of agriculture should not be denied validity upon

the ground that it may *indirectly* affect their production. After all, we are living in a 'realistic world. And while "man doth not live by bread alone," economic considerations in aid of a group which has been a dominant factor in our national life from the very beginning of our nation's existence should not be considered so evil as to contaminate the proper exercise by the Congress of its plenary control over commerce between the states. See Lemke v. Farmers' Grain Co. (1922) 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458; Shafer v. Farmers' Grain Co., supra.

If the indirect effect were controlling, few of the valid exercises of the taxing and commerce clauses of the Constitution could stand.

In practically every instance it can be pointed out (*and it was, when they were attacked*) that the commerce power was used to affect indirectly the conduct of persons and to achieve through its exercise beneficial local results.

No one can deny, for instance, that the Harrison Narcotic Act (see 26 U.S.C.A. § 1040 et seq. and notes), both in its taxing features and the added features which prohibit interstate shipment of narcotics, was aimed at the destruction of the traffic in narcotics, and of its deleterious effects upon users. In the Mann Act, the commerce clause was used to discourage not only commercialized vice, but even sporadic meretricious relations. The various fruit inspection and grain standards acts aim to achieve better standards in agricultural products. In many instances, the exercise of the commerce power is *the. only way to achieve a desired result.* The Supreme Court has said so repeatedly. Thus in Lemke v. Farmers' Grain Co., supra, 258 U.S. 50, at page 60, 42 S.Ct. 244, 248, 66 L.Ed. 458, to the argument that the state of North Dakota, by endeavoring to regulate public grain elevators, had sought to protect the grain growers from certain bad commercial practices, the answer of Mr. Justice Day was: "It is alleged that such legislation is in the interest of the grain growers and essential to protect them from fraudulent purchases, and to secure payment to them of fair prices for the grain actually sold. *This may be true, but Congress is amply authorized to pass measures to protect interstate commerce if legislation of that character is needed.* The supposed inconveniences and wrongs are not to be redressed by sus-

taining the constitutionality of laws which clearly encroach upon the field of interstate commerce placed by the Constitution under federal control." (Italics added.) Similar language was used in Shafer v. Farmers' Grain Co., supra, 268 U.S. 189, at page 202, 45 S.Ct. 481, 486, 69 L.Ed. 909: "The defendants make the contention that we should assume the *existence of evils* justifying the people of the state in adopting the act. The answer is that there can be no justification for the exercise of a power that is not possessed. *If the evils suggested are real, the power of correction does not rest with North Dakota but with Congress, where the Constitution intends that it shall be exercised* with impartial regard for the interests of the people of all the states that are affected." (Italics added.) Thus, congressional legislative practice and judicial declarations give sanction to the power of Congress to affect market conditions through the exercise of the commerce clause.

■ None of the features of direct control of production which the processing portions of the act contained and which the court condemned in United States v. Butler, supra, is present in the marketing features. There are no direct benefits, promised or given, under direct or indirect coercion, in exchange for limitation of production. We only have an attempt (*beneficial to agriculture, it must be admitted*) to affect the market of agricultural commodities through the exercise of the plenary power of the Congress to regulate commerce. Under the authorities cited, this power implies the right to *advance, enhance, promote, foster, restrain,* and *prohibit.* Unless we promulgate the doctrine that even indirect aid to agriculture is beyond the scope of our Federal Government and cannot be achieved through constitutional means, other than by grants of money, and thus belie a century of congressional legislative practice to the contrary (see Edward S. Corwin, "The Taxing Power of Congress," (1922) 37 Harvard Law Review, 548), we must conclude that the power to regulate commerce implies the right to exercise it to achieve beneficial results in the marketing of agricultural products.

■ Nor is their validity impaired by unlawful delegation of legislative power.

The power to make laws is deemed among the most important in constitutional

governments. By the Constitution of the United States all legislative power is granted to the Congress (Constitution of the United States, art. 1, § 1), and the Congress is empowered to make all laws necessary and proper in carrying into execution its general powers (Constitution of the United States, art. 1, § 8, cl. 18). Courts guard jealously against any attempt of the legislative authority to delegate its power to others. Marshall Field & Co. v. Clark (1892) 143 U.S. 649, 12 S.Ct. 495, 36 L. Ed. 294; 3 Willoughby on The Constitution (2d Ed.) § 1075 et seq. However, the legislative power may declare its will and, after fixing a primary standard, delegate to others the duty of prescribing the administrative methods of carrying it into effect. See Buttfield v. Stranahan (1904) 192 U.S. 470, 24 S.Ct. 349, 48 L. Ed. 525; Union Bridge Co. v. United States (1907) 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523; St. Louis, Iron Mt. & Southern R. Co. v. Taylor (1908) 210 U. S. 281, 28 S.Ct. 616, 52 L.Ed. 1061; Atlantic Coast Line R. Co. v. North Carolina Corporation Commission (1907) 206 U.S. 1, 27 S.Ct. 585, 51 L.Ed. 933, 11 Ann. Cas. 398; Interstate Commerce Commission v. Illinois Central R. Co. (1910) 215 U.S. 452, 30 S.Ct. 155, 54 L.Ed. 280; Interstate Commerce Commission v. Northern Pacific R. Co. (1910) 216 U.S. 538, 30 S. Ct. 417, 54 L.Ed. 608; Louisville & N. R. Co. v. Interstate Commerce Commission (C.C.1910) 184 F. 118; Hampton & Co. v. United States (1928) 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624; United States v. Shreveport Grain & Elevator Co. (1932) 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175; United States v. Grimaud (1911) 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563; Panama Refining Co. v. Ryan (1935) 293 U.S. 388, 55 S.Ct. 241, 256, 79 L.Ed. 446. These cases show the utmost variety of instances in which the lodging of discretion and the right to exercise judgment has been sustained as without the constitutional injunction against delegation of legislative power. They range from the right to determine the purity, quality, and fitness of a food product upon the recommendation of experts (see Buttfield v. Stranahan, supra), to the exercise by the Interstate Commerce Commission of the right to fix "just and reasonable" rates (Louisville & N. R. Co. v. Interstate Commerce Commission, supra; and see Interstate Commerce Commission v. Brimson (1894) 154 U.S. 447,

14 S.Ct. 1125, 38 L.Ed. 1047), and the great powers given to the President under flexible tariff provisions (see Hampton & Co. v. United States, supra). The test of nonlegislative delegation of power is: Has the Congress provided the administrative or executive officer with a clear and definite standard to follow? If so, and the discretion is exercised with the aim to achieve that standard, the means of achieving it do not matter. See Marshall Field & Co. v. Clark, supra; see, also, note on Permissible Limits of Delegation of Legislative Power, 79 L.Ed. 474. The conditions of validity exist when, as Mr. Justice Cardozo stated in his dissent in Panama Refining Co. v. Ryan, supra: "Discretion is not unconfined and vagrant. It is canalized within banks that keep it from overflowing." The provisions of the Agricultural Adjustment Act under attack here comply with the tests of legitimacy of delegation thus laid down.

Briefly stated, the act declares its policy to regulate market conditions in such a manner as to produce parity of prices to the farmer. In the case of each product, there is established what is denominated a "base period." The statistical information filed in the Department of Agriculture forms the foundation for determining the price during the period. The act of the Secretary of Agriculture in that respect becomes merely a matter of mathematical calculation. As to shipment, the act provides that an order be issued by the Secretary of Agriculture providing for the manner of limiting shipments and allotting the commodities to each handler in interstate commerce during a specified period. To determine this amount, the Secretary of Agriculture may avail himself of the results of local hearings had by local committees, at his direction. He determines the limitation after he has received the result of the investigation, and enters into a marketing agreement, with the consent of a majority of the producers. So we have a standard to be attained, strictly limited by the Congress. Even the methods pursued in attaining them are delineated to a certain extent by providing what the orders should contain.

The mechanics of *ascertaining* the congressional standard as to each product is left to the determination of the Secretary of Agriculture upon the basis of factual inquiries determined either by reference to governmental statistics or by

reference to actual facts determined upon hearings.

It is the act of Congress, and not the act of the Secretary of Agriculture, which *primarily* results in control of the market of agricultural products. The Secretary of Agriculture merely fills in the details within the framework of the declared legislative purpose. This is not delegation of legislative power. See United States v. Grimaud, supra; Union Bridge Co. v. United States, supra, 204 U.S. 364, at page 386, 27 S.Ct. 367, 51 L.Ed. 523. No other questions require discussion.

An interlocutory injunction as prayed for in the bill of complaint will issue.