**YOUNG v. KELLEX CORPORATION et al.**
Civil Action No. 754.

United States District Court
E. D. Tennessee, N. D.

Jan. 2, 1948.

Southern & Southern and Ann Nigro, all of Knoxville, Tenn., for plaintiff.

R. R. Kramer and Porter Greenwood, both of Knoxville, Tenn. (Kramer, Mc-Nabb & Greenwood, of Knoxville, Tenn., of counsel), for defendants.

TAYLOR, Chief Judge.

This is an action for overtime, liquidated damages, and attorney's fee under the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201 to 219, for a period of employment beginning November 19, 1944, and extending to September 16, 1945, and for double time under Executive Order No. 9240, as amended by Executive Order No. 9248, and as set out as a note under Section 326 of Title 40, U.S.C.A. Suit was commenced in the Circuit Court of Roane County, Tennessee, and removed to this Court, defendant in removal relying on diversity of citizenship, jurisdictional amount of claim, and involvement of a federal question. Plaintiff Glenn M. Young sues for himself and all others similarly situated, but no other plaintiffs are named. The named defendants are Kellex Corporation and M. W. Kellog Company, both foreign corporations, the former allegedly a subsidiary of the latter. M. W. Kellog Company was not served with process and is not in court.

It has been stipulated by the parties that during his period of employment with Kellex Corporation plaintiff worked a total of 1568 overtime hours, exclusive of overtime on days classed as 7th consecutive days; also, that from May 6, 1945, to August 19, 1945, plaintiff was paid in full for all Sunday work, as 7th consecutive days of work,

but that prior to May 6, 1945, he was not paid for any seventh consecutive day of work.

During the period under consideration, plaintiff was employed by Kellex Corporation as "transportation manager," having charge of a motor pool at Oak Ridge, Tennessee, and being responsible for keeping all automobiles of the pool in condition and readiness for use, as well as having under his supervision about 20 chauffeurs and chauffeurettes.

Several points of controversy appear in the case. Plaintiff claims he was an hourly employee, receiving a base pay of $1.62½ per hour. Defendant insists that plaintiff was paid a weekly salary, not an hourly wage; also, that plaintiff has been fully paid. Plaintiff claims that he was a laborer, within the meaning of the Fair Labor Standards Act and entitled to its benefits. Defendant contends that plaintiff was an executive, being a transportation manager with certain executive functions, or an administrator, having power to hire and fire subordinate employees, hence exempted from coverage of the Act. Plaintiff claims that he was engaged in an occupation necessary to the production of goods for interstate commerce, within the meaning of the Act, and within the rule of Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83, and related cases. Defendant insists that plaintiff's employer, hence plaintiff also, was engaged in original construction and for that reason not within the coverage of the Act.

Proof has been taken on the controverted points and briefs have been filed. It has been admitted on behalf of plaintiff that in order to recover under the Act, plaintiff must prove one of the following: (1) That he was engaged in interstate commerce; or, (2) that he was engaged in the production of goods for interstate commerce; or (3) that his occupation was necessary to the production of goods for interstate commerce.

As regards recovery under the Act, plaintiff places his reliance on requirement No. 3, and has directed the burden of his proof to the end that he was engaged in an occupation "necessary to the production" of goods of commerce, within the requirements of Section 203(j) of the Act. Only the Act is relied on as requiring payment of time and one-half for overtime, liquidated damages, and attorney's fee. Executive Order No. 9240 is relied on as authorizing double time for Sundays, as 7th consecutive days within the workweeks, although recovery for Sunday work as overtime under the Act has not been treated as excluded.

Although plaintiff has placed reliance on Executive Order No. 9240, as amended by Executive Order 9248, it has not been shown how the Order applies in plaintiff's favor, nor has defendant demonstrated that it does not apply. Counsel's brief for defendant refers to the case of Wells et al. v. Ford, Bacon and Davis, Inc., 6 F.R.D. 606, decided by the District Court for Western District of Kentucky, and affirmed without opinion by 6 Cir., 145 F.2d 240. But in that case the claim of plaintiffs under the Executive Order was dismissed on the ground that plaintiffs had not properly joined themselves in the purported class action. It was not necessary under the decision there for the court to construe the Executive Order as it might have applied in a proper case.

In the case here, plaintiff sues alone and claims more than the minimum jurisdictional amount. It is not seriously contended that plaintiff cannot join his claim under the Executive Order to his claim under the Fair Labor Standards Act, if that were necessary to confer jurisdiction. Also, plaintiff here relies on the Executive Order only for recovery of double time for 7th consecutive days, which the court in the Wells case observed was provided for in the Executive Order. Dictum of the Wells case is to the effect that the Executive Order does not require payment of time and one-half for overtime. That case is no authority for holding that Executive Order 9240 either is, or is not, applicable to the case here. Nor, apparently, is any authority to be found in judicial decisions.

Executive Order No. 9240, as amended by Executive Order No. 9248, was before the New York courts in Steiner v. Pleas-

antville Constructors, Inc., 1944, 182 Misc. 56, 49 N.Y.S.2d 42. There the court held that plaintiff was not entitled to recover double time for Sunday work under the provisions of the Fair Labor Standards Act, and in its very brief opinion the court added, "Executive Order No. 9240, as amended by Executive Order No. 9248, * * * is not binding on the defendant." Plaintiff there was a dock worker for a contractor engaged in construction of a training base. The court did not explain why the Executive Order was not binding on defendant. The decision was affirmed without opinion by the Appellate Division. 269 App.Div. 738, 54 N.Y.S.2d 700.

In Barrett v. National Malleable & Steel Castings Co., D.C.1946, 68 F.Supp. 410, plaintiffs sought recovery of double time for "7th consecutive days." There plaintiffs relied on the Fair Labor Standards Act, and the court held that the Act did not provide for double time for 7th consecutive days. Although conditions contemplated by the Executive Order were present, apparently the Order was not relied on. That the Order was in the court's mind is indicated by the fact that the court cited the Steiner case, supra.

As the question of recovery for double time under the Executive Order is before the Court here, it is necessary to inquire into the applicability of that Order. Executive Order No. 9240, as amended by Executive Order 9248, is set out in full in 40 U.S.C.A., as a note under section 326.

It provides in part as follows:

"V. All Federal departments and agencies affected by this order shall refer to the Secretary of Labor for determination questions of interpretation and application arising hereunder. In any industry or occupation in which the Secretary finds that a wage stabilization agreement approved by a Government department or agency is operating satisfactorily, or in any industry or occupation in which the Secretary finds that the nature and exigencies of operations make such action necessary or advisable for the successful prosecution of the war, the Secretary may determine that any or all of the provisions of this order shall not apply to such industry or occupation or to any classes of employees therein."

That Executive Order No. 9240 was not intended to apply in every case where war work was being done, is plainly implicit in the language quoted. It was stipulated by the parties here that defendant did pay plaintiff for his 7th consecutive days from May 6, 1945, which is some indication that the Executive Order was then made effective as to employees of defendant. Sunday pay was continued to August 19, 1945. It may have been only a coincidence that payments in line with the Executive Order were discontinued after August 19, 1945, but Executive Order 9240 was revoked August 22, 1945. Executive Order No. 9601, 40 U.S.C.A. § 326 note, 10 F.R. 10275.

Also implicit in the quoted language is an intention that the Order shall be applied administratively, if at all, and that the Order does not of itself create rights in favor of employees which can be enforced in the courts. This conclusion is implied in other language of the Order, which directs the manner in which the Order will be given effectiveness.

"II. All Federal departments and agencies shall conform the provisions in all existing and future contracts negotiated, executed, or supervised by them to the policies of this order. All such departments and agencies shall immediately open negotiations to alter provisions in existing contracts to conform them to the requirements of this order."

Implication from this provision is, that the rights of employees under Executive Order No. 9240, if they exist at all, are derivative—not from the Order itself, but from contracts that incorporate its provisions. If through an exercise of administrative discretion it is found that the Order should be applied in a particular situation where work is being done under Government contract, and if the contract between the Government and the contractor incorporates the wage provisions of the Order, then the employee of the contractor, if he otherwise qualifies, becomes a beneficiary of the contract and, as a third party beneficiary, has a litigable right. If the provisions of the Order are not incorporated in the contract between the Govern-

ment and the contractor, then rights as third party beneficiary do not arise.

Crabb v. Welden Bros. et al., D. C.1946, 65 F.Supp. 369 seems to be within the reasoning above set forth. That was an action for premium payments brought by employees of contractors engaged in construction of the Alcan Highway, and included a claim for double time for 7th consecutive days, as provided in Executive Order No. 9240, as amended by Executive Order No. 9248. There the court found that the contracts between the Government and the construction contractors had incorporated the provisions of Executive Order No. 9240. Accordingly the court held that the employees had a litigable right—to sue for double time for 7th consecutive days.

It is the opinion of the Court here that Glenn M. Young falls within the converse of the above decision, for the reason that he has failed to show in his case that a relation of third party beneficiary existed. His action to that extent fails, there being, so far as appears, no other manner in which the Executive Order can be applied for his benefit. Introduced as defendant's exhibit No. 1. was a memorandum from the United States Engineer Office of Manhattan District to the Area Engineer, New York Area, dated December 6, 1943, in which it was stated that a certain wage policy would be enforced as to field employees of defendant. One of the rules set out in the memorandum called for payment of double time for 7th consecutive days for employees earning up to $90 per week base pay. Although there is some indication that defendant adhered to the declared policy, it does not appear that this policy was incorporated into a contract between the Government and defendant corporation so as to become a basis of derivative rights in favor of plaintiff.

It remains to be determined whether plaintiff can recover for overtime, liquidated damages, and attorney's fee under the provisions of the Fair Labor Standards Act. It is plaintiff's theory that he was a laborer, rather than an executive or administrative employee; and that he was engaged in an occupation necessary to the production of goods for commerce.

There is no disagreement as to what was produced at Oak Ridge, where plaintiff was employed, and during the period of his employment. The product, in so far as identity is possible, was the atomic bomb, or some essential ingredient thereof. The inclusion of "by-products" in plaintiff's declaration was not followed up in the proof and briefs. On the contrary, plaintiff subsequently asserted, and defendant admitted, that every activity at Oak Ridge during the employment period had the atomic bomb as its objective.

It is not necessary to extend the finding of facts beyond that point. That manufacture of the atomic bomb, or ingredients thereof, was the sole objective of all work at Oak Ridge, is the decisive fact. In view of that single, unique objective, it must be held that plaintiff was not engaged either directly or indirectly in the production of goods for commerce. The atomic bomb was not an article of commerce.

Plaintiff has directed almost no effort to establishment of the necessary basic fact, but, rather, has assumed that the atomic bomb was goods for interstate commerce, an assumption apparently inspired by the knowledge that the atomic bomb, or its ingredients, moved across state lines. Nor has defendant gone to any great length to bring the issue here into sharp focus. This dereliction of controversy is easily understandable, for the reasons that the atomic bomb was the product of manufacture, had form and substance, and moved across state lines, international boundaries, and oceans. Yet it was not a commercial article; it merely looked like one.

In so far as the Court is aware, this is a case of first impression from a factual point of view. It has called for intensive study, particularly as to what constitutes interstate commerce and articles of interstate commerce. Numerous cases have been examined in a search for satisfactory definitions of commerce, and goods, or goods for commerce. Some courts have read in the Fair Labor Standards Act an intention on the part of Congress to reach every human

activity that can be reached under the commerce clause of the Constitution, Article 1, § 8, cl. 3. Others have found only an intention to reach industries engaged in commerce, viewed in a practical sense and in the light of traditional acceptation of such terms as trade, commerce, transportation, goods, wares, products, commodities, and merchandise.

■ The Act has been fruitful of litigation. It has been construed to cover many activities, some of extreme remoteness as regards interstate commerce. But when the Act is read with an eye to its general concept and purpose, one is impressed by the recurrence of terms that fit in with a practical idea of commerce, namely, that commerce is passing of merchandise from one state to another, from one person to another, to be sold in competition with other goods in ordinary channels of trade. To a person engaged in it, there is ordinarily little mystery to the meaning of commerce. It is only in following its infinite variations that borderline cases are encountered, where the ties between state and state commercially, with respect to a particular article, cease to be perceptible, and interstate commerce, as a tangible thing, disappears. That an attempt to fit the atomic bomb into any practical concept of interstate commerce is destined to failure, is soon apparent. Inquiry leads almost at once to where the trails run out.

■ To understand that the atomic bomb was not an article of commerce, it is necessary only to consider what commerce is, as courts have understood it. Commerce is not a theory, hence courts have declined to define it in exact terms. They have considered specific problems and determined whether interstate commerce existed in a particular instance. General notions, rather than exact standards, have guided them in construction and application of laws relating to interstate commerce. Whether the law involved has been a tariff act, an anti-trust act, an interstate commerce act, a labor act, or some other, constantly have appeared in the cases traditional ideas that commerce is buying and selling, that goods for commerce are those which are to be transported from seller to buyer,

that somewhere there is a consumer willing to pay a price, that he buys from the one who offers him the most pleasing bargain, that wherever there is transportation it is for hire, engaged in for profit, as a business, that subjects of transportation are persons who pay fares or goods for which freight is paid. Wherever variations from these notions appear, they are mere excrescences made to grow upon the traditional forms. The essential fabric and pattern of concepts continue as of old.

From earliest times ours has been a commercial nation, and decisions requiring inquiry into the nature of commerce were among the first. In Gibbons v. Ogden, 9 Wheat. 1, 189, 6 L.Ed. 23, Chief Justice Marshall said: "It (commerce) describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse."

In what respects is the atomic bomb concerned with commercial intercourse between nations, and where are the rules which prescribe how that intercourse shall be carried on? Who are the purchasers of the bomb, and what price does it command?

In Brown v. State of Maryland, 12 Wheat. 419, 438, 25 U.S. 419, 438, 6 L.Ed. 678, Chief Justice Marshall said: "No goods would be imported, if none could be sold." At page 446 of 12 Wheat. he said: "Commerce is intercourse—one of its most ordinary ingredients is traffic * * * Sale is the object of transportation, and is an essential ingredient of that intercourse, of which importation constitutes a part."

The case of Welton v. State of Missouri, 91 U.S. 275, 23 L.Ed. 347, presents these clear implications: (1) That commerce is intercourse for purposes of trade; (2) that transportation is not an abstraction, but is the carrying of commodities of trade; and (3) that commerce contemplates a seller in one state and a buyer in another state, or in a foreign country. In stating general principles, Mr. Justice Field said: "Commerce is a term of the largest import. It comprehends intercourse for the purposes of trade in any and all its forms, including the transportation, purchase, sale, and ex-

change of commodities between the citizens of our country and the citizens or subjects of other countries, and between the citizens of different states * * *. The power which insures uniformity of commercial regulation must cover the property which is transported as an article of commerce * * * until it has mingled with and become a part of the general property of the country * * *." The learned justice took for granted that the "main object of that commerce" was "the sale and exchange of commodities."

There is perceptible in the cases a gradual enlargement of the concept of commerce, yet it has not become large enough to comprehend the atomic bomb, for the atomic bomb has not existed, and does not now exist, for purposes of trade—in any form. It has not been transported as an article of commerce, and it has not mingled with, nor become a part of the general property of the country.

Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 277, 49 L.Ed. 518, held that certain acts of Swift & Co. violated the Act of July 2, 1890, 15 U.S.C.A. §§ 1–7, 15 note, to "Protect Trade and Commerce against Unlawful Restraints and Monopolies." The Act involved, 26 Stat. 209, aimed at prohibiting restraints of trade and enacted under the commerce clause of the Constitution, recognizes that commerce primarily is trade. The same idea stands out in Hooper v. People of State of California, 155 U.S. 648, 655, 15 S.Ct. 207, 210, 39 L.Ed. 297, where the court said: "If the power to regulate interstate commerce applied to all the incidents to which such commerce might give rise and to all contracts which might be made in the course of its transaction, that power would embrace the entire sphere of mercantile activity in any way connected with trade between the states."

Here appears the comprehensive term, "mercantile activity." But even if the "entire sphere of mercantile activity" were held to come within the meaning of interstate commerce, in no respect has it appeared that the atomic bomb was an element of mercantile activity. The atomic bomb is not a merchantable article in the sense that it is for sale. Many weapons of war can be bought for a price, but so far as appears the atomic bomb is—as yet —without price.

In Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S.Ct. 650, 654, 81 L.Ed. 953, the profit motive appeared as an ingredient of commerce. The court said in that case: "The Associated Press is engaged in interstate commerce within the * * * meaning of Article I, section 8 of the Constitution. It is an instrumentality set up by constituent members who are engaged in a commercial business for profit."

Other ingredients appear in Commonwealth of Pennsylvania v. State of West Virginia, 262 U.S. 553, 43 S.Ct. 658, 67 L. Ed. 1117, 32 A.L.R. 300, where the words "customers" and "consumers" are prominent. At page 595 of 262 U.S., at page 664 of 43 S.Ct. the court said: "We turn now to the principal issue, whether a state wherein natural gas is produced and is a recognized subject of commercial dealings may require that in its sale and disposal consumers in that state shall be accorded a preferred right of purchase over consumers in other states * * *."

In State of Oklahoma v. Kansas Natural Gas Co., 221 U.S. 229, 31 S.Ct. 564, 55 L. Ed. 716, 35 L.R.A., N.S., 1193, appears another term, which, in its language and by comparison, further suggests the nature of commerce. The term is, "commercial product." In holding unconstitutional a state statute which prohibited the flow of natural gas into interstate commerce, the court quoted with approval the case of State ex rel. Corwin v. Indiana & Ohio Oil, Gas and Mining Co., 120 Ind. 575, 22 N.E. 778, 6 L.R.A. 579, saying: "These propositions were announced: (1) Natural gas is as much a commodity as iron ore, coal, or petroleum or other products of the earth, and can be transported, bought, and sold as other products. (2) It is not a commercial product when it is in the earth, but becomes so when brought to the surface and placed in pipes for transportation. (3) If it can be kept within the state after it has become a commercial product, so may corn, wheat, lead, and iron." [221 U.S. 229, 31 S.Ct. 571]

Whatever the statute or the nature of the litigation considered, if it pertains to commerce the same ideas emerge: Commerce is transportation of commodities. Commerce is a dealing in commercial products. Commerce is purchase, sale, or exchange of merchandise. Commerce is commercial intercourse. Goods are things which are bought and sold. Articles or subjects of commerce are those things, tangible or intangible, which are communicated, transmitted, or transported as a business, for pay, or for profit, and as concomitants of business transactions.

In County of Mobile **v.** Kimball, 102 U. S. 691, 26 L.Ed. 238, the court, in considering that portion of commerce that was within the regulatory power of Congress under the commerce clause, included "that portion of commerce with foreign countries or between the States which consists in the transportation, purchase, sale, and exchange of commodities." In Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 10, 49 S.Ct. 1, 3, 73 L.Ed. 147, the court said: "In determining what is interstate commerce, courts look to practical considerations and the established course of business. * * * Interstate commerce includes more than transportation; it embraces all the component parts of commercial intercourse among states."

In holding unconstitutional the Trade-Mark Act of 1876, the Supreme Court said in the In re Trade-Mark Cases, 100 U.S. 82, 96, 25 L.Ed. 550: "While bearing in mind the liberal construction, that commerce with foreign nations means commerce between citizens of the United States and citizens and subjects of foreign nations, and commerce among the States means commerce between the individual citizens of different States, there still remains a very large amount of commerce, perhaps the largest, which, being trade and traffic between citizens of the same State, is beyond the control of Congress."

■ Commerce, as a word, suggests business dealings, not in intangibles or things of non-commercial character, but in articles of trade. As indicated in Webster's Unabridged Dictionary, the word is compounded of the Latin "cum," meaning with, and the French word "merx," meaning merchandise. In the Latin, the combination was "commercium," suggesting commodities for exchange or sale. The ancient notion of commerce has continued, with variations, without loss of meaning. In Austin v. State of Tennessee, 179 U.S. 343, 21 S.Ct. 132, 45 L.Ed. 224, the court said: "Whatever product has from time immemorial been recognized by custom or law as a fit subject for barter or sale, particularly if its manufacture has been made the subject of Federal regulation and taxation, must, we think, be recognized as a legitimate article of commerce although it may to a certain extent be within the police power of the states. Of this class of cases is tobacco. From the first settlement of the colony of Virginia to the present day tobacco has been one of the most profitable and important products of agriculture and commerce * * *." Similarly trade and profit motives are discernible as inseparable from commerce, whether that commerce consists of sale of articles for cash, or their exchange for other articles, just as the idea of commerce is inseparable from that of merchandise. In the License Cases, Thurlow v. Commonwealth of Massachusetts, 5 How. 504, 12 L.Ed. 256, Chief Justice Taney said: "But spirits and distilled liquors are universally admitted to be subject to ownership and property, and are therefore subjects of exchange, barter and traffic, like any other commodity in which a right of property exists, and Congress, under its general power to regulate commerce with foreign nations, may prescribe what article of merchandise shall be admitted and what excluded. * * *"

■ It has been observed in this case that the atomic bomb, or its ingredients, crossed state lines, which provided a basis for the assumption that the bomb was an article of commerce. The crossing of state lines is an important factor in determining that a thing is in interstate commerce, provided that which crosses is itself commercial in character, as where cattle are driven across a state line, or are permitted to range across it. Thornton et al. v. United States, 271 U.S. 414, 46 S.Ct. 585,

70 L.Ed. 1013. Or, where securities pass from state to state for sale. Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 61 L. Ed. 480, L.R.A.1917F, 514, Ann.Cas.1917C, 643. Or, where telegraphic messages are communicated from state to state. Western Union Telegraph Co. v. Lenroot, 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414. Or, where advertising of a commercial character travels between states. Ford Motor Co. v. Federal Trade Com., 6 Cir., 120 F.2d 175. Or, where electricity is transmitted across state lines. Utah Power & Light Co. v. Pfost, D.C., 52 F.2d 226.

But the fact that an article crosses state lines is not conclusive of its being an article of commerce, or of its being in interstate commerce. It could hardly be said that personal articles, such as a watch in its owner's pocket, are "goods in commerce," though they travel with their owner across state lines. Though baseball players travel from state to state, take their paraphernalia with them, and play for money, they are not engaged in interstate commerce, and their employers or owners are not engaged in interstate business, within the meaning of the anti-trust laws. Federal Baseball Club of Baltimore, Inc., v. National League of Professional Baseball Clubs et al., 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898, 26 A.L.R. 357. In the Baseball case, the court (Holmes, J.) said, 259 U.S. at page 208, 42 S.Ct. at page 465: "Of course the scheme requires constantly repeated travelling on the part of the clubs, which is provided for, controlled and disciplined by the organizations, and this it is said means commerce among the States. * * * But the fact that in order to give the exhibitions the Leagues must induce free persons to cross state lines and must arrange and pay for their doing so is not enough to change the character of the business. * * * the transport is a mere incident, not the essential thing. That to which it is incident, the exhibition, although made for money would not be called trade or commerce in the commonly accepted use of those words. As it is put by the defendants, personal effort, not related to production, is not a subject of commerce. That which in its consummation is not commerce does not become commerce among the States because the transportation that we have mentioned takes place. To repeat the illustrations given by the Court below, a firm of lawyers sending out a member to argue a case, or the Chautauqua lecture bureau sending out lecturers, does not engage in such commerce because the lawyer or lecturer goes to another State."

A relevant provision of the Fair Labor Standards Act, Sec. 203(i), reads in part: "'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof * * *."

By application of the familiar construction rule of ejusdem generis, "articles or subjects of commerce" fall into the same class as goods, wares, products, commodities, and merchandise, in the sense that they are articles of trade, capable of being reduced to possession and retained for commercial purposes, or transmuted into a form of service, or exchanged or sold in the commercial world. And the words "or any part or ingredient thereof" would come within the same rule, relating back to goods, wares, etc., and in order to qualify as goods for commerce, subject to the same requirements as those of a complete commodity, in the sense that neither is an article of commerce unless it meets the requirements of one.

It is not enough that goods exist as a result of productive processes. They must be goods of commerce, or wares of commerce, or merchandise of commerce, after they have been produced. And so the inquiry goes back to the question of what are goods for commerce?

Because of its inherent nature, an article may be excluded from the class. For example, migratory birds, which cross state lines and international boundaries, are not commodities in interstate commerce, and it was only pursuant to treaty enforcement that congressional protection could be extended to them. United States v. Shauver, D.C., 214 F. 154; United States v. McCullagh, D.C., 221 F. 288; Cochrane v. United States, 7 Cir., 92 F.2d 623. Though wild game is killed and reduced to posses-

tion, and the hunter lives outside the state, his possession and limited property right in the game do not make it goods for commerce. Title may remain in the state, in trust for the people. Geer v. State of Connecticut, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793. Also, commodities, animate and inanimate, and persons as well may be excluded from commerce by statute, and such things or persons are not goods for, or subjects of, commerce. As beer in transit, where it enters a state where it is outlawed. Richmire v. Legg, D.C., 3 F.Supp. 787. Or, convict-made goods, where intention is to ship them into a state where their sale is unlawful. Kentucky Whip & Collar Co. v. Illinois Cent. R. Co., 299 U.S. 334, 57 S.Ct. 277, 81 L.Ed. 270. Diseased livestock may be excluded from interstate commerce, and thus lose their character as goods for commerce. 23 Stat. 31, 21 U.S.C.A. § 112 et seq.; Reid v. State of Colorado, 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108. Same as to lottery tickets. 28 Stat. 963 [now 18 U.S.C.A. §§ 832–835, 1301, 1302]; Champion v. Ames, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492. Same, as to a carrier's own goods. 34 Stat. 584, 49 U.S.C.A. § 1 et seq.; United States v. Delaware & Hudson Co., 213 U.S. 366, 29 S.Ct. 527, 53 L.Ed. 836. Same, as to adulterated and misbranded articles, under the Pure Food and Drugs Act. 34 Stat. 768, 21 U.S.C.A. § 1 et seq.; Hipolite Egg Co. v. United States, 220 U.S. 45, 31 S.Ct. 364, 55 L. Ed. 364. Same, as to transportation of women for immoral purposes. 36 Stat. 825 [Now 18 U.S.C.A. §§ 2421–2424]; Hoke v. United States, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523, 43 L.R.A., N.S., 906 Ann. Cas.1913E, 905. Same, as to intoxicating liquors under national prohibition. 37 Stat. 699, 27 U.S.C.A. § 122; 39 Stat. 1069, 27 U.S.C.A. § 1 note; Clark Distilling Co. v. Western Maryland Ry Co., 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326, L.R.A.1917B, 1218, Ann.Cas.1917B, 845; United States v. Hill, 248 U.S. 420, 39 S.Ct. 143, 63 L.Ed. 337. Same, as to diseased plants. 39 Stat. 1165, 7 U.S.C.A. § 161; Oregon-Washington R. & Nav. Co. v. State of Washington, 270 U.S. 87, 46 S.Ct. 279, 70 L.Ed. 482. Same, as to stolen motor vehicles. 41 Stat. 324 [now 18 U.S.C.A. §§ 10, 2311–2313];

Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407. Same, as to kidnapped persons. 47 Stat. 326, 48 Stat. 781 [now 18 U.S.C.A. § 1201]; Gooch v. United States, 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522.

Various reasons or legislative policies explain why certain things are declared not to be articles for interstate commerce and excluded from that commerce, such as anticipated harm that might result from their admission to commerce, or the evil purpose associated with the transportation, or the frustration of valid state laws, or the gross misuse of interstate commerce, or the need for protecting personal liberty, or the desire of Congress to maintain certain policies with respect to interstate commerce.

The commerce clause of the Constitution provides that Congress shall have power "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." The Constitution does not define commerce. Nor has any definition been found that is broad enough to include the atomic bomb. In Carter v. Carter Coal Co. et al., 298 U.S. 238, 239, at pages 297 and 298, 56 S.Ct. 855, at page 867, 80 L.Ed. 1160, the Supreme Court, in holding invalid certain provisions of the Bituminous Coal Conservation Act of 1935, 50 Stat. 90, said: "We first inquire, then—What is commerce? The term, as this court many times has said, is one of extensive import. No all-embracing definition has ever been formulated. The question is to be approached both affirmatively and negatively—that is to say, from the points of view as to what it includes and what it excludes. * * * As used in the Constitution, the word 'commerce' is the equivalent of the phrase 'intercourse for the purposes of trade,' and includes transportation, purchase, sale, and exchange of commodities between the citizens of the different states. * * *"

For purposes of trade! The idea has never changed. For the Constitution to have defined it, would have been superfluous. Borrowing words from Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 220, 61 L.Ed. 480, L.R.A.1917F, 514,

Ann.Cas.1917C, 643, "Such are the declarations of the cases, become platitudes by frequent repetition and many instances of application."

■ In the light of the foregoing, it is apparent that the atomic bomb was not an article of commerce, or goods for commerce, within the meaning of the Fair Labor Standards Act—where its meaning is no different from the meaning of commerce as courts have understood it since the adoption of the Constitution, or, for all of its variations and vicissitudes, since the beginning of time. Ancient caravans braved perils of desert and wilderness, and merchantmen those of the seas, because at journey's end profits beckoned in the world's marketplaces. The motive is changeless. Though articles of commerce have become countless and illimitably varied, the heart of the trader has not changed. In the commercial world, goods are made to be sold, men buy them and re-sell them as a business, and they are brought into being and moved from maker to consumer, because men who make them and move them derive the gain upon which commerce lives and grows.

■ Judged by traditional and persistent concepts, the atomic bomb was not an article of commerce. In reaching that conclusion, the Court has taken, and does take, judicial knowledge of recent history. Walling v. Patton-Tulley Transp. Co., 6 Cir., 134 F.2d 945, 946. It is necessary to recount but a little of that history.

In late 1941 the United States Government turned its thought seriously to the task of producing an atomic weapon. Eminent scientists had said that such a weapon could be made, and it was known that enemies of the United States were experimenting extensively and urgently in search of a way to make it. It was believed by nuclear scientists that if and when the atomic weapon came into use it would be catastrophic in its effect upon its victim. In collaboration with the British and Canadian governments a decision was made to undertake the herculean task of developing and producing an atomic weapon. Because of the remoteness of the United States from the theater of war and of the financial and scientific resources of this country, it was decided that the project should be carried on here, though the three cooperating governments agreed to a pooling of preliminary information on the subject of nuclear fission and to placing that information in the custody and at the disposal of the United States Government.

How to make an atomic bomb was not known. Consequently plants were constructed in which various procedures were to be tried, and laboratory facilities of America's great universities were enlisted in the search for a method. In addition, the Government established laboratories of its own, and to the various laboratories were called the greatest scientists of the free nations, as well as scientists who had been forced to flee from their native countries. The project was placed under the direction of the Secretary of War, and the actual working out of it was intrusted to the United States Engineer Department. That department set up what came to be familiarly known as the Manhattan District, and the Manhattan District brought into being the vast experimental and processing plants, one of which, known as Clinton Engineer Works, was located at Oak Ridge, Tennessee. The greatest urgency characterized the drive behind the undertaking, and the fabulous sum of two billion dollars was poured into it.

Despite the tremendous expenditures and the rush of men, women and materials into the work of construction, only a select few knew that an atomic bomb was the goal. From the rest, the nature of the project was sealed off, not alone in the interest of wartime secrecy, but also in the interest of future security. Even after the first bomb was used in war, the weapon remained behind a screen of strict surveillance, and the mechanics of it were and are—it is hoped —still restricted to the close custody of the United States Government.

Although success had been achieved in making an atomic bomb, the Government hesitated to introduce it into warfare, because of its appalling deadliness. It was used only to save American forces from having to undergo the terrible ordeal of a

war on the Japanese homeland. As part of the decision to use it, there was recognition of the need for continued secrecy, or for international controls against its future use, an understanding amply confirmed by the frightful effectiveness of the bombs that were used against the enemy. Coincident with news of the new weapon were warnings that the bomb must not become a general weapon of war, but must be suppressed, or brought within the control of the United Nations, or of some other international organization vested with powers of a super-government with respect to atomic energy controls.

Yet the weapon has not been outlawed. Nor has it been brought under international control. Secrecy—or the illusion of it—still enshrouds it, and the Armageddon envisaged by many as darkening the horizon of tomorrow commands secrecy and monopolistic production more urgently than the peril which inspired its creation.

In all the vast prelude of activity, expenditure, marshaling of scientific genius, and the blazing horror of Hiroshima and Nagasaki, the suggestion that the atomic bomb was "goods for commerce" strikes a discordant note. The program of unified and intensified research in nuclear energy was conceived at a time when human liberty hung in the balance. Development of an atomic weapon was pressed as a possible final hope for victory. There appeared no announcement then, nor has any appeared afterwards, remotely intimating that the atomic bomb should be, or become, an article of commerce.

In one sense the atomic bomb could remotely have approached the character of an article of commerce. Had it been the property of private individuals, made and sold to the Government, as some weapons were made and sold; or, had it been the subject of lend-lease, as were many weapons and munitions of war, made under government contract; or had it been sold by the Government, as many other weapons were sold, there might have existed some shadow of reason for holding that the atomic bomb was an article of commerce within the meaning of the Fair Labor Standards Act. But the usual elements of private manufacture, ownership and sale were here submerged in the overwhelming tide of contribution from government and government-recruited scientific genius. As near as a thing could be so made, the atomic bomb was produced by the United States as a government and a people. Its making was financed by the Government. Title to basic materials and finished product was at all times in the Government. From inception of the idea of producing a bomb to delivery of the bomb on its military objectives, there was unrelaxing supervision and direction by the Government. Though for reasons deemed sufficient to the Government, private corporations were employed in construction and production processes, the sovereign was always present as general owner, directing the work, directly or indirectly paying all bills, receiving the finished product into its exclusive custody. And though the atomic bomb moved across state lines, it entered into no commercial competition. It remained everywhere in Government custody and was everywhere impressed with the sovereign character, and never did it remotely become merchandise, as that term is understood in judicial decisions and in the commercial world. Some things, it has been seen, are not goods for commerce, although they cross state lines. Some do not enter the stream of commerce because they are free, as migratory birds. Some by statute are excluded from the stream, as diseased plants and animals. Some by judicial decision are not goods for, or in, commerce, though they cross state lines, because they are not commodities. Possessing as it does the power to destroy the human race, the atomic bomb cannot escape into the marketplaces of nations, except to bring upon the world universal disaster. Beceause of its cataclysmic potentialities, the atomic bomb is excluded by its nature from being goods in commerce. Here, then, appears the anomaly of a *thing*, having form and substance, a manufactured article which crosses state lines, international boundaries, and oceans, yet is not a commodity in any sense with which the commercial or the judicial mind is familiar. In the purest meaning of a classical term, it is sui generis.

If there remained any doubt that the atomic bomb was not, and is not, an article of commerce, that doubt would be resolved by a reading of the Atomic Energy Act of August 1, 1946. Title 42 U.S.C.A. § 1801 et seq.

As a declaration of policy the Act looks forward to a time when atomic energy may be used for "improving the public welfare, increasing the standard of living, strengthening free competition in private enterprise, and promoting world peace," but as a practical statute it serves a more exacting purpose, that of keeping atomic weapons, as opposed to atomic energy, closely confined to Government custody and rigidly excluded from channels of trade.

Section 4 provides:

"(b) Prohibition. It shall be unlawful for any person to own any facilities for the production of fissionable material or for any person to produce fissionable material, except to the extent authorized by subsection (c) of this section.

"(c) Ownership and operation of production facilities.

"(1) Ownership of Production Facilities. The Commission (United States Atomic Energy Commission), as agent of and on behalf of the United States, shall be the exclusive owner of all facilities for the production of fissionable material other than facilities which (A) are useful in the conduct of research and development activities in the fields specified in section 3, and (B) do not, in the opinion of the Commission, have a potential production rate adequate to enable the operator of such facilities to produce within a reasonable period of time a sufficient quantity of fissionable material to produce an atomic bomb or any other atomic weapon. * * *

"(e) Manufacture of Production Facilities. Unless authorized by a license issued by the Commission, no person may manufacture, produce, transfer, or acquire any facilities for the production of fissionable material. * * *"

Not only does the Act exclude from private hands the making of atomic bombs; it prohibits the production of fissionable materials, except under severest restrictions. Anything that might lead to production of the atomic bomb is rigidly excluded from commerce, so that except in violation of law neither the atomic bomb nor the ingredients of an atomic bomb can become goods for commerce.

"Sec. 5. (a) Fissionable Materials.—

"(2) Government ownership of all fissionable material.

"All right, title, and interest within or under the jurisdiction of the United States, in or to any fissionable material, now or hereafter produced, shall be the property of the Commission, and shall be deemed to be vested in the Commission by virtue of this Act. * * *

"(3) Prohibition. It shall be unlawful for any person, after sixty days from the effective date of this Act to (A) possess or transfer any fissionable material, except as authorized by the Commission, or (B) export from or import into the United States any fissionable material, or (C) directly or indirectly engage in the production of any fissionable material outside of the United States."

"Sec. 6(b) Prohibition. It shall be unlawful for any person to manufacture, produce, transfer, or acquire any equipment or device utilizing fissionable material or atomic energy as a military weapon, except as may be authorized by the Commission."

The quoted parts are representative of the purpose and effect of the whole Atomic Energy Act. With the raw materials and manufacturing facilities brought within such a rigid government ownership and control, any notion that the atomic bomb was, or is, an article of commerce, is definitely ruled out. Coverage of the Fair Labor Standards Act did not, therefore, extend to the plaintiff.

It results that defendant is entitled to judgment, and an order will be entered accordingly.