BORDAS & Co., demandante y recurrente, *v.* SECRETARIO DE AGRICULTURA, demandado y recurrido.

Número: 254 Resuelto: 28 de febrero de 1963

*M. Orraca Torres*, abogado del recurrente; *J. B. Fernández Badillo, Procurador General,* y *Nilita Vientós Gastón, Procurador General Auxiliar,* abogados del recurrido.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

En el cumplimiento de sus deberes oficiales dos funcionarios del Departamento de Agricultura de Puerto Rico hicieron declaraciones juradas ante un juez del Tribunal de Primera Instancia haciendo constar lo siguiente:

(a) Que la demandante introdujo a Puerto Rico, por el muelle número 9 de San Juan, 260 sacos de café crudo provenientes de Nueva York, dando detalles precisos de la fecha de importación, del conocimiento de embarque, del número del viaje y nombre del barco, del nombre de la firma exportadora y de su dirección.

(b) Que dicho café fue introducido por la demandante infringiendo la Ley Núm. 35 de 11 de mayo de 1934, 5 L.P.R.A. secs. 581–589, y en violación de la orden, llamada Cuarentena Núm. 4 de Sanidad Vegetal, 5 R.&R.P.R. sec. 581–4 expedida por el Secretario de Agricultura de Puerto Rico bajo autoridad de la antes citada Ley Núm. 35.

(c) Que a pesar de que un funcionario del Departamento de Agricultura ordenó detener en el muelle dicho embarque de café, la demandante lo trasladó a otro sitio en Puerto Rico.

Mediante una orden de allanamiento expedida por un magistrado, los referidos funcionarios se incautaron de 121 sacos de ese café, quedando los mismos almacenados bajo la cus-

todia del Departamento de Agricultura. Alega el demandado que la demandante dispuso del balance de los sacos de café que no fueron encontrados.

La demandante radicó en el Tribunal Superior una demanda de Sentencia Declaratoria solicitando que el tribunal resolviese: "(a) Que la demandante es dueña del café incautado; (b) Que la Ley Núm. 35 de 11 de mayo, 1934 y la Cuarentena Núm. 4, promulgada a tenor de dicha ley por el Departamento de Agricultura y Comercio de Puerto Rico es inconstitucional por aplicación al caso de epígrafe, por ser esta materia regulada exclusivamente por la '*Plant Quarantine Act*' de 20 de agosto, 1912, y el Aviso de Cuarentena número 73, antes referido; (c) Que los demandados están moral y legalmente impedidos de confiscar dicho café; (d) Que los demandados deben entregar inmediatamente a la demandante el referido producto; y (e) Que se condene a los demandados al pago de costas y honorarios de abogado."

Compareció el demandado y en su contestación alegó, en síntesis, que actuó bajo la Ley Especial Sobre Importaciones de Café de Áreas Infectadas, Ley Núm. 184 de 11 de mayo de 1938, 5 L.P.R.A. secs. 610–612, y bajo la Ley General de Sanidad Vegetal, Ley Núm. 35 de 11 de mayo de 1934, 5 L.P.R.A. secs. 581–589; que confiscó el café porque éste no venía acompañado del certificado de inspección correspondiente, 5 L.P.R.A. 581 (Ley Núm. 35), y por venir el mismo de un país que importa café de países donde existe el insecto *Stephanoderes Coffeae,* cuya introducción constituye un peligro para la agricultura de Puerto Rico, 5 L.P.R.A. sec. 610 (Ley Núm. 184). Negó que esta materia esté reglamentada en forma exclusiva por el Gobierno Federal y afirmó que las citadas disposiciones federales no son contrarias ni hacen ineficaces las leyes locales sobre la materia.

La demandante alegó también en su demanda que la introducción de ese café se hizo con el visto bueno del Departamento de Agricultura de Puerto Rico, cosa que negó expre-

samente el demandado en su contestación y afirmó que, por el contrario, el Departamento se opuso a dicha introducción, lo cual motivó este pleito.

Como materia nueva el demandado alegó al contestar:

(1) Que "el demandante provocó esta situación e impidió al Secretario de Agricultura ejercer su discreción en cuanto a la manera de disponer del café incautado al desobedecer la orden de detención del café y levantarlo del muelle en contravención expresa de la orden del funcionario recurrido."

(2) Que "el demandante en abierta violación a la orden de detención del Secretario de Agricultura trasladó el café a su almacén dejando en el muelle sólo 9 sacos. Que al enterarse el Departamento de Agricultura de que los sacos habían sido levantados del muelle inspeccionó los Almacenes Bordas encontrando que de los sacos levantados el demandante había dispuesto de 130 sacos cuyo paradero ignora el demandado hasta la fecha a pesar de las diligencias hechas para averiguarlo."

(3) Que "al inspeccionar sólo quedaban 121 sacos que fueron identificados como parte del lote detenido. Que el Secretario de Agricultura volvió a ordenar al demandante que retuviera los sacos de café que aún quedaban en su almacén hasta nueva orden, a lo que se comprometió el señor Bordas. Que a pesar de esta nueva orden del Secretario de Agricultura el señor Bordas trató de trasladar el café a la Torrefacción Betancourt el 28 de enero de 1957, hecho que no se llevó a efecto porque el Departamento de Agricultura tenía guardia montada y pudo impedirlo ya que la firma Betancourt al enterarse de que el café había sido detenido por orden del Secretario de Agricultura se negó a recibirlo. Que en esta misma fecha se obtuvo la orden de allanamiento para colocar el café bajo custodia."

En 21 de septiembre de 1959 el Tribunal Superior dictó una extensa Resolución favorable al demandado, resolviendo, en síntesis, que la reglamentación federal y la local no eran conflictivas sino concurrentes y cumplementarias, que el demandado había actuado bajo autoridad de ley, que no procedía la devolución del café a la demandante, y que el demandado estaba obligado a disponer del café de acuerdo con lo prescrito por la ley.

En 25 de ese mismo mes de septiembre de 1959 la demandante radicó una moción solicitando que el tribunal ampliase su resolución haciéndola más explícita sobre las facultades del demandado para disponer del café, expresó que tenía evidencia de que el café no estaba infestado y solicitó también que el demandado tostase el café a costa de la demandante y se le entregase a ella. El día 16 del mes siguiente (octubre de 1959) la demandante radicó otra moción interesando ahora practicar prueba sobre las alegaciones de la demanda y de la moción anterior. Cinco días después, en 21 de octubre de 1959, la demandante radicó una solicitud de Revisión en el Tribunal Supremo de Puerto Rico (Revisión 223) señalando cuatro errores sustancialmente iguales a los que señala en el presente recurso, los cuales transcribimos más adelante. El Tribunal Supremo, en 20 de noviembre de 1959 resolvió no haber lugar a expedir el auto de revisión solicitado en aquella ocasión.

En 25 de noviembre de 1959 la demandante radicó en el Tribunal Superior otra moción solicitando que el tribunal resolviese todas las cuestiones en controversia planteadas en el caso. El día 30 de ese mes de noviembre de 1959 el Tribunal Superior dictó una Sentencia en la cual resolvió (1) que el demandado actuó bajo autoridad de ley, (2) que el demandado no puede entregar el café a la demandante y está obligado a retenerlo para disponer de él en la forma que prescribe la ley, (3) que al actuar en la forma que lo hizo la demandante perdió su derecho a disponer libremente del café de conformidad con las Leyes Núms. 184 y 35 antes citadas, y (4) que la sentencia disponía de todas las cuestiones planteadas por el demandante en su solicitud de sentencia declaratoria.

Ante nos recurre la demandante y señala que el tribunal a quo erró: (1) "Al resolver que el demandado está obligado por disposición expresa de la Ley Núm. 35 de 11 de mayo de 1934 a actuar en la forma que lo hizo; (2) "Al resolver

que de conformidad con las disposiciones de la ley, el demandado no puede entregar el café al demandante y está obligado, por el contrario, a retenerlo para disponer de él en cualquiera de las formas que prescribe la ley;"

(3) "Al resolver que al actuar en la forma que lo hizo el demandante perdió su derecho a disponer libremente del café, de conformidad con las disposiciones de la Ley 184 de 11 de mayo de 1938 y la Ley Núm. 35 del año 1934; (4) "Al no celebrar una vista en su fondo, brindándole oportunidad a la recurrente de ofrecer evidencia respecto a las alegaciones de la demanda, dictando sentencia declarando sin lugar la demanda."

En su memorando ante nos la recurrente, al referirse al segundo error, nos dice que "este error está prácticamente discutido en el anterior" y añade un párrafo; y al referirse al tercer error no lo discute porque, nos dice, "este error lr hemos discutido en el anterior."

La realidad es que lo que plantea la recurrente es que el Secretario de Agricultura de Puerto Rico actuó ilegalmente porque, en su opinión, las leyes de Puerto Rico no lo autorizan a confiscar el café en cuestión y porque esas leyes de Puerto Rico sobre la materia, sostiene ella, son inconstitucionales por estar en conflicto con legislación federal que rige el asunto con exclusividad. Al efecto nos dice en su memorándum: "Nuestra contención es de que la Ley Núm. 35 de 11 de mayo de 1934 está supeditada a la Ley del Congreso Federal Núm. 20, aprobada en 1912, y a la Cuarentena Núm. 73 que tienen el control absoluto de la importación del café crudo a Puerto Rico, por lo que el recurrido no está obligado a actuar como lo hizo, y ni siquiera tenía derecho a ello."

■ Debemos resolver en primer lugar, si el Secretario de Agricultura y sus agentes actuaron dentro de ley, ya que si su actuación fué ilegal bajo las leyes de Puerto Rico, correspondería fallar a favor de la recurrente y no tendríamos

que entrar a considerar la constitucionalidad de esas leyes. Sabido es que la validez de las leyes se presume, *Pueblo* v. *Pérez*, 83 D.P.R. 539, 544 (1961), y que los tribunales no juzgarán la constitucionalidad de las mismas a menos que sea indispensable para resolver el caso ante ellos, *E.L.A.* v. *Aguayo*, 80 D.P.R. 552, 595–600 (1958); *Ashwander* v. *Tennessee*, 297 U.S. 288, 346 (1935). Si el demandado actuó legalmente en el desempeño de deberes impuéstoles o en el ejercicio de facultades concedídales por las leyes de Puerto Rico, consideraremos la validez constitucional de las referidas leyes y de ser éstas válidas, veremos si el tribunal a quo cometió algún error que justifique la revocación de su sentencia.(¹)

## I.

La Ley Núm. 35 de 11 de mayo de 1934, 5 L.P.R.A. secs. 581–589, tiene como objeto "evitar la introducción en Puerto Rico de agentes causantes de enfermedades en las plantas, de insectos . . . perjudiciales a las plantas, . . . [y] el control de plagas . . . y enfermedades de plantas en Puerto Rico." Leyes de Puerto Rico, 1934, pág. 299. Dicha ley (las citas son de 5 L.P.R.A.) dispone:

"Sec. 581.—No se importará en Puerto Rico ningún árbol, arbusto, o sus semillas, o cualquier otra planta, . . . *sin traer un certificado* firmado por un entomólogo o fitopatólogo del Gobierno o por la persona que tenga la autoridad requerida en el estado, territorio, o distrito, de donde la importación proceda, expresando que dichos artículos están aparentemente libres de enfermedades o insectos perjudiciales a las plantas."

(¹) A propósito de la revisión judicial, en su excelente artículo titulado *"The Origin and Scope of the American Doctrine of Constitutional Law"* publicado en 7 Harv. L. Rev. 128, el ilustre profesor James B. Thayer señala el respeto que a los tribunales debe merecerle la expresión legislativa, *i.e* democrática, concretada en una ley y, citando al conocido profesor y juez Cooley, dice a la p. 144: "One who is a member of a legislature may vote against a measure as being, in his judgment, unconstitutional; and, being subsequently placed on the bench, when this measure, having been passed by the legislature in spite of his opposition, comes before him judicially, may there find it his duty, although he has in no degree changed his opinion, to declare it constitutional."

"Toda planta o material de plantas que se importe sujeta a las disposiciones de las secs. 581 a 589 de este título deberá venir libre de arena, suelo o tierra, exceptuando aquel material empacado en tierra esterilizada que haya pasado inspección en los puertos del Continente; Entendiéndose, que dicho material deberá venir acompañado de un aviso de embarque expedido por el Departamento de Agricultura de Estados Unidos, y en su envase original, y será inspeccionado por un agente debidamente autorizado por el Secretario de Agricultura y Comercio. Este aviso de embarque se requerirá para embarques que hayan sido enviados a Puerto Rico inmediatamente después de ser inspeccionados en el Continente por el Negociado de Sanidad Vegetal Federal; *Disponiéndose*, que para los embarques que han sido entregados al comercio local en el Continente y han sido más tarde enviados a Puerto Rico, se aceptará un certificado de inspección firmado por el representante del Departamento de Agricultura del estado donde han sido reembarcados." . . . (Subrayado nuestro.)

La Sec. 582 hace aplicable todas las disposiciones de esta ley a las estaciones experimentales de los Gobiernos Estadual y Federal, "cuando no estuvieren en conflicto con las leyes federales que específicamente sean aplicables a Puerto Rico."

La Sec. 586 dispone lo siguiente:

"(a) Ninguna persona, . . . traerá a Puerto Rico de ningún otro estado, territorio o distrito de los Estados Unidos, ninguno de los artículos, animales o insectos cuya importación se somete a condiciones en las secs. 581 a 589 de este título, a menos que lo haga de acuerdo con las disposiciones expresadas en ellas; y en cada embarque de tales artículos, animales o insectos, se hará una descripción completa de ellos, en el manifiesto, facturas y conocimiento de la persona, razón social, corporación o porteador que conduzca los mismos a Puerto Rico, y se expresará en esa descripción, dónde se hizo el embarque, de quién se recibieron los artículos y a quién se han consignado."

"(b) A la llegada de los artículos, animales o insectos, cuya introducción esté sujeta a condiciones según las secs. 581 a 589 de este título a cualquiera de los puertos designados en la sec. 583 de este título, la persona, razón social, corporación o por-

teador que los conduzca, dará aviso de su llegada por escrito al Secretario de Agricultura y Comercio; *y no dispondrá de ellos hasta que el inspector los haya investigado y haya dado permiso por escrito para su levantamiento.*"

"(c) Si un inspector u otro agente debidamente autorizado, encontrase plantas o sus productos u otros artículos sujetos a las disposiciones de cualquier cuarentena puesta en vigor según se dispone en las secs. 581 a 589 de este título, *en movimiento o haber sido movidos, o en posesión de alguna persona, en infracción de las secs. 581 a 589 de este título, o de cualquier cuarentena o reglamentos* dictados bajo las secs. 581 a 589 de este título, *queda autorizado para apoderarse de dicho material y puede destruirlo* o de otro modo disponer de él, o puede ordenar que se retire inmediatamente del Estado Libre Asociado, u ordenar cualquier tratamiento que crea necesario en bien del interés público." (Subrayado nuestro.)

La Sec. 558, "a fin de evitar la introducción en Puerto Rico . . . de insectos y enfermedades de plantas perjudiciales a la agricultura," faculta al Secretario de Agricultura para prohibir o restringir la entrada a Puerto Rico, o el movimiento dentro de la Isla, de cualesquiera plantas o productos vegetales capaces de albergar tales insectos o enfermedades. Dicha sección faculta al Secretario a promulgar "una cuarentena que restrinja la entrada de las materias que aquí se especifican, de los Estados, Territorios, y Distritos que se mencionen, o el movimiento dentro de Puerto Rico; especificando las restricciones impuestas . . . que rigen la entrada o movimiento." También dispone dicha sección que el Secretario de Agricultura "queda por la presente autorizado a promulgar toda regla o reglamento razonables que requieran las secs. 581 a 589 de este título y tales reglas y reglamentos tendrán toda la fuerza [de ley]."

La Ley Núm. 184 de 11 de mayo de 1938, 5 L.P.R.A. secs. 610–612, tiene el objeto de "proteger el café de Puerto Rico de plagas existentes en otros países." Leyes de Puerto Rico, 1938, p. 384. La Sec. 610 lee como sigue:

"Será ilegal la introducción en Puerto Rico de plantas, semillas o granos de café o envases usados para café, procedentes de los países donde exista el insecto "Stephanoderes coffeae" *o de cualquier otro país en el cual se haya importado plantas, semillas o granos de café procedentes de los susodichos países; Disponiéndose,* que esta prohibición no incluye el grano de café tostado o molido." (Subrayado nuestro.)

La Sec. 612 autoriza al Secretario de Agricultura para promulgar las reglas necesarias para el cumplimiento de esta Ley Núm. 184.

En ejercicio de la facultad concedídale al Secretario de Agricultura de Puerto Rico por la citada Ley Núm. 35 de 1934, éste promulgó la Cuarentena Núm. 4, 5 R. & R.P.R. sec. 581–4, en la cual luego de expresar que "el café es una de las principales cosechas" de Puerto Rico;[2] que "hay peligro de introducir en las semillas, plantas o productos del café plagas de insectos y enfermedades nuevas;" y que "las semillas necesarias para el desarrollo de los sembrados pueden producirse en el país;" determina que queda "prohibida la introducción de plantones, arbustos, semillas o productos del café en su estado natural, procedentes de los Estados Unidos y sus territorios; Disponiéndose, que se permitirá la introducción de café tostado cuando éste se ajuste a lo especificado en la ... Ley Federal de Tarifas de 1930 y las Leyes estatales Núms. 77 de mayo 5, 1931, y Núm. 7 de abril 9, 1934, 3 L.P.R.A. secs. 2201 a 2205; y disponiéndose además, que se permitirá la introducción de semilla y plantas de café para fines experimentales y de propagación hecha por las estaciones experimentales de los gobiernos Federal y Estatal, según queda dispuesto en la Ley Núm. 35 de mayo 11, 1934, 5 L.P.R.A. secs. 581 a 589."

[2] Sigue siéndolo. En su mensaje sobre la situación del país a la Asamblea Legislativa, en 14 de febrero de 1963, el Gobernador informó que "La cosecha de café se ha calculado en 350,000 quintales, igual que la del año anterior y unos 90,000 más que en el 1960." Texto del mensaje publicado en *El Mundo* de 16 de febrero de 1963, p. 22.

Continúa dicha cuarentena: "Todo plantón, arbusto o semilla de café que se intentare introducir en Puerto Rico en violación a estas disposiciones, será devuelta al sitio de origen o destruida, según lo disponga el Secretario de Agricultura y Comercio."

"Cualquier café crudo introducido a la Isla en violación de la Ley Núm. 77 de 1931, a la Ley Núm. 35 de 1934 . . . y a esta cuarentena, y confiscado que fuere por las autoridades estatales o federales, quedará bajo la vigilancia de la Sección de Sanidad Vegetal del Departamento de Agricultura y Comercio, la cual ordenará su torrefacción antes de que se permita su uso en el Estado Libre Asociado de Puerto Rico."

 Confrontados con esas disposiciones explícitas de ley contenidas en la Ley Núm. 35 y la Ley Núm. 184, especialmente las citadas secs. 586(c), 610 y 612 del Título 5 de L.P.R.A., hay que concluir que el Secretario de Agricultura y sus agentes actuaron bajo autoridad de ley local. El problema, en cuanto a este punto, no es, como parece entender la demandante al formular su primer señalamiento de error, si el Secretario está *obligado* a actuar en la forma en que lo hizo. El problema es si el Secretario está *facultado* o no por la ley para actuar como actuó. La torrefacción del café confiscado es mandatoria solamente si el Secretario permite el uso en Puerto Rico del mismo. La razón es que al torrefaccionarlo, proceso que incluye tostarlo y molerlo, presumiblemente se matarían los insectos dañinos o plagas que el café tuviese. La Ley Núm. 35 expresamente dispone que si un inspector encontrase plantas o sus productos, sujetos a las disposiciones de una cuarentena formulada en virtud de dicha ley, que estén (dichas plantas o sus productos) en movimiento o que hayan sido movidos ilegalmente, dicho inspector *"queda autorizado para apoderarse de dicho material y puede destruirlo . . ."* 5 L.P.R.A. sec. 586(c). De los autos no surge qué acción tomó el Secretario sobre

el café excepto confiscarlo, para lo cual estaba plenamente facultado.

## II

■ La contención de que la Ley Núm. 35 de 1934 es nula porque la materia está regida exclusivamente por el Congreso no es correcta. La historia, la jurisprudencia y la propia ley del Congreso son adversas a tal planteamiento. En esta área de protección y fomento de la agricultura los dos gobiernos, el estatal y el federal, han ejercido y ejercen jurisdicción concurrente, y aún más, es común que funcionen en cooperación mutua. Un autorizado resumen sobre el asunto aparece en el capítulo sobre la agricultura del *Informe de la Comisión Sobre Relaciones Inter-Gubernamentales* (Commission on Intergovernmental Relations) sometido por esa Comisión al Presidente de los Estados Unidos y enviado por éste al Congreso en 28 de junio de 1955.(³) Sobre el punto que nos ocupa dicha comisión informó:

"El primer Comisionado de Agricultura federal fue nombrado por el Presidente Lincoln en 1862. Ese mismo año comenzó la cooperación entre el gobierno federal y los gobiernos estatales [en asuntos agrícolas]. . . A fines del 1800 la cooperación se extendió al área de la inspección de artículos y ambos gobiernos, el federal y los estatales, comenzaron a supervisar el movimiento de productos agrícolas en el comercio. El gobierno federal se propuso evitar que se transportasen en el comercio interestatal productos que pudiesen ser dañinos a los animales, las cosechas o a la salud de las personas. Los estados iniciaron medidas similares en cuanto al comercio interestatal. Estas actividades han aumentado a través de los años según nuevas plagas y enfermedades han entrado al país y a medida que los medios de transportación se han tornado más complejos." *Message From the President of the United States Transmitting the Final Report of the Commission on Intergovernmental Relations,* 84th Cong., 1st. Session, House Document No. 198, pp. 150–151.

_____

(³) Esa comisión fue creada por la Ley Pública Núm. 109 de 10 de julio de 1953 para estudiar las relaciones entre el Gobierno Federal y los gobiernos estatales. 67 Stat. 145; 68 Stat. 20; 69 Stat. 7.

Para otros estudios sobre el tema, los cuales sostienen lo antes expresado, pueden verse Gaus, *"Agricultural Policy and Administration in the American Federal System,"* Cap. 15 del libro *Federalism, Mature and Emergent,* ed. por MacMahon, Doubleday, N. Y., 1955, (⁴) y Bowie & Friedrich, *Studies in Federalism,* 1954, pp. 444–458. (⁵) Para más ejemplos de cooperación oficial entre los gobiernos estatales y el federal véase Freund en el citado simposio *Federalism, Mature and Emergent,* p. 162–163; y el mismo autor y otros en *Constitutional Law, Cases and Other Problems,* 2d. ed. (1961), Vol I, pp. 748–750 y 760. En esta y otras áreas de gobierno el genio político–jurídico anglosajón ha dado paso a la creación y desarrollo de instituciones funcionales y flexibles que evolucionan con el tiempo. Sería pecar de ingenuidad el tratar de aprisionar en nítidos diagramas mentales las relaciones vivas y dinámicas que existen, en perenne adaptación y readaptación, entre los componentes de una gran organización federal. La realidad no siempre se presenta en la forma de más cómoda clasificación e interpretación.

En el área del derecho constitucional entran en juego dos conceptos fundamentales en este problema. Primero en tiempo y en el ámbito que cubre está en poder público del estado *(police power)* y segundo, el ya vasto poder del gobierno federal para supervisar el comercio interestatal. Como se sabe, toda comunidad políticamente organizada tiene lo que hemos llamado el poder público del estado *(police*

---

(⁴) "Congress passed three important acts in 1862 that set a policy of national-state participation [in agricultural matters] that not only persists but also has been expanded to include local government units." Gaus, obra citada, p. 283.

(⁵) "The overall problem of the relation between the state and federal governments and the independent initiative left to each depended on current needs... That this course was possible and reasonably successful is an indication of the capacity of the American federal system to meet the requirements of a dynamic economy." Bowie and Friedrich, obra citada, p. 444.

*power)* para salvaguardar la seguridad, la salud y el bienestar de sus habitantes. Dicho poder residía en los estados desde antes de redactarse la constitucion federal; no fue delegado al gobierno federal y continúa residiendo en los estados. *Brown* v. *Maryland,* 12 Wheaton 419, 442 (1827) ; *Barbier* v. *Connolly,* 113 U.S. 27, 31 (1885) ; Weaver, *Constitutional Law* (1946), p. 491([6]) Es en el ejercicio de ese poder público *(police power)* que los estados legislan para proteger su agricultura, su ganadería, su flora y su fauna. *Savage* v. *Jones,* 225 U.S. 501, 525 (1912) ; *Miller* v. *Schoene,* 276 U.S. 272, 279–280 (1928) ; *Reid* v. *Colorado,* 187 U.S. 137 (1902) ; *Kelleher* v. *French,* 22 F.2d 341 (1927), confirmado en 278 U.S. 563 (1928) ; Anotación *"Validity of Statutes, Ordinances, or Regulations for Protection of Vegetation Against Disease or Infection",* 70 A.L.R.2d 852 y ss., especialmente las secs. 2, 3, 21 y 22. Ambas jurisdicciones, la estatal y la federal, cooperan para hacer más efectiva la lucha contra las plagas pero la facultad de una no depende de la otra, *Thornton* v. *U.S.,* 271 U.S. 414, 423 (1926) ([7]) Para evitar o reducir el riesgo de que se propaguen las enfermedades dañinas a la vegetación y a la agricultura, a veces es necesario perjudicar o destruir propiedad privada, sin compensación, *Miller* v. *Schoene,* supra, p. 280; *Kelleher* v. *French,* supra, p. 343. El ejercicio del poder público *(police power)* no se torna ilegal o nulo porque afecte incidentalmente el comercio interestatal, *Savage* v. *Jones,* supra, p. 525; ni porque cause perjuicios económicos, *Texaco Inc.* v. *Secretario de Obras Públicas,* 85 D.P.R. 712, (1962) ; *Goldblatt* v. *Town of Hempstead,* 369 U.S. 590, 592 (1961).

[6] "The power ... is a branch of the police power, *which unquestionably remains, and ought to remain, with the states."* (Subrayado nuestro.) Juez Pres. Marshall, en *Brown* v. *Maryland,* supra, 442.

[7] "In order to make the action of both [State and Federal Governments] more effective, they may cooperate so that their respective purposes may be more effectively carried out, but the power of each to act in its field does not depend upon the consent of the other." 271 U.S. 423.

Corresponde que examinemos la Ley de Cuarentena Vegetal del Congreso y la Cuarentena Núm. 73 del Secretario de Agricultura de los Estados Unidos para ver si en efecto son incompatibles con la Ley Núm. 35 de Puerto Rico y con la Cuarentena Núm. 4 del Secretario de Agricultura de Puerto Rico. La disposición pertinente de la ley federal es muy extensa y no sería práctico reproducirla aquí *verbatim* pero expondremos en síntesis su contenido pertinente. Se trata de la Sec. 8 de la citada Ley de Cuarentena Vegetal de 20 de agosto de 1912, según enmendada y su texto puede verse en 7 U.S.C.A. sec. 161.(8)

■ Dicha Ley de Cuarentena Vegetal del Congreso, 7 U.S.C. sec. 161, autoriza al Secretario de Agricultura de los Estados Unidos a poner bajo cuarentena a cualquier estado, o parte de un estado (*any portion thereof*), cuando estime que ello es necesario para evitar la propagación de cualquier plaga dañina a la vegetación. Prohibe que de un estado o lugar que haya así sido puesto en cuarentena *se saquen* productos cubiertos por la cuarentena y se transporten a otros estados o lugares de Estados Unidos. Es obvio que el propósito de esa disposición es proveer un mecanismo mediante el cual se pueda evitar que un área infestada infeste a otra que no lo esté. Puede verse que la Ley Núm. 35 de Puerto Rico no conflige con la ley federal pues no pretende permitir lo que la ley federal prohibe, sino que más bien ambas leyes se complementan. La ley de Puerto Rico lo que dispone es que para importar a Puerto Rico plantas o semillas éstas deben venir certificadas como libre de plagas por la autoridad correspondiente del estado o lugar de donde los productos procedan. O sea, en ausencia de acción por el Secretario de Agricultura de los Estados Unidos, la agricultura de Puerto Rico estaría expuesta a ser perjudicada o destruida por plagas que se importasen con productos infestados, si

---

(8) En su aspecto formal, esa sección es un ejemplo de como redactar leyes; consiste de un solo párrafo que llena dos páginas de U.S.C.A. y contiene cuatro "disponiéndoses".

la ley y el Secretario de Agricultura de Puerto Rico no pudiesen evitar su importación. Pero Puerto Rico tiene la facultad y el deber de proteger su agricultura. Se trata, como hemos visto anteriormente al examinar la jurisprudencia, de un caso de ejercicio del poder público *(police power)* y el propio Tribunal Supremo de los Estados Unidos ha declarado que esa facultad se puede ejercer aunque incidentalmente roce el área de comercio interestatal, *Savage* v. *Jones*, supra, p. 525. Es natural que así sea; primero tiene que existir la agricultura en los diversos estados para que luego pueda haber comercio interestatal de productos agrícolas.

En esta etapa de la discusión debemos considerar el incidente del caso *Oregon–Wash. Co.* v. *Washington*, 270 U.S. 87 (1926), en el cual se basa la recurrente en su alegato. Al considerar una ley de cuarentena del estado de Washington a la luz de la ley federal de cuarentena ya citada, el tribunal opinó que "era imposible" leer el estatuto federal sin "atribuirle al Congreso la intención" de hacerse cargo del cuidado de la agricultura de los estados (p. 99) y que por lo tanto la ley estatal no podía subsistir. La realidad es que esa no había sido la intención del Congreso y dicho cuerpo se apresuró a decirlo. El caso de *Oregon–Wash.* se resolvió en marzo 1 de 1926 y en 13 de abril de ese año el Congreso le adicionó a esa Sec. 8 de la ley, 44 Stat. 250, 7 U.S.C. sec. 161, sus últimos tres disponiéndose mediante los cuales reinstaló el poder de los estados sobre la materia y dejó sin efecto el referido caso. (⁹)

Al efecto, en *Hinkle* v. *Railway Express Agency*, 6 So.2d 417, 420 (1942) se dijo: "[E]l propósito del Congreso al

---

(⁹) "Formerly it was argued that common law was superior to legislation because it was customary and rested upon the consent of the governed. Today we recognize that the so-called custom is a custom of judicial decision, not a custom of popular action. We recognize that legislation is the more truly democratic form of law-making. We see in legislation the more direct and accurate expression of the general will."—Pound, *"Common Law and Legislation"*, 21 Harv. L. Rev. 383, 406 (1908).

formular la enmienda de 1926 fue el de reinvestir a los estados de su poder público. Así aparece del lenguaje expreso contenido en el último disponiéndose de la enmienda. El caso de *Oregon–Washington Railroad and Navigation Co.* v. *Washington* . . . fue decidido antes de la enmienda y no es aplicable. Obviamente dicha enmienda fue hecha para contrarrestar esa decisión."

■ Pero si fuese necesario, para uno cerciorarse mejor de la intención del Congreso, aunque ésta aparece en forma explícita en la mencionada enmienda del 1926, pueden verse las discusiones que tuvieron lugar en el Congreso cuando se consideraba la mencionada enmienda. El Congresista Jones expresó lo siguiente: "Hace algunas semanas que el Tribunal Supremo . . . falló que la reglamentación de cuarentena de los diferentes estados es nula porque el gobierno federal ha ocupado el campo bajo su poder de reglamentar el comercio interestatal. El propósito de esta medida es sencillamente permitir a los estados que continúen la reglamentación que no esté en conflicto con la reglamentación federal o cuando la reglamentación federal no cubra la cosecha o cosa que la ley estatal se proponga cubrir." *Congressional Record —House*, Vol. 67, Part. 7, p. 7053 *in fine*.

El Congresista Bankhead dijo: "El resultado de esa decisión *(Oregon–Washington)* era que las autoridades estatales quedaron sin facultad para controlar la importación de semillas o plantas infestadas, las cuales se estaban entrando en nuestro estado y causando allí grandes daños. Este proyecto de ley corregirá rápidamente esa situación. . ." *Congressional Record—House*, ibid, p. 7054.

En el mismo sentido pueden verse las manifestaciones de los Congresistas Hill y Summers en el mismo tomo citado, págs. 7056–7058. Naturalmente, cuando surgieron los hechos del caso de autos, en el 1959, la anteriormente descrita era la situación de derecho, porque como hemos señalado, la enmienda a la ley federal que dejó sin efecto el caso de

*Oregon–Washington*, supra, fue hecha en el 1926 y el caso de *Hinkle*, supra, fue resuelto en el 1942.

■ Dentro de esa situación de coexistencia de las reglamentaciones federal y estatales y de cooperación entre ambas jurisdicciones para combatir las plagas y enfermedades de las cosechas que contempla y hace posible la ley federal ¿puede decirse que la Cuarentena Núm. 4 del Secretario de Agricultura conflige con la Cuarentena Núm. 73 del Secretario de Agricultura de los Estados Unidos? No están en conflicto pues ambas cubren situaciones distintas. Habiendo determinado el Secretario de Agricultura de los Estados Unidos que en varios países abundan una serie de plagas dañinas al café, en ejercicio de las facultades que le confiere la antes mencionada Ley de Cuarentena Vegetal, 7 U.S.C. secs. 151–167, prohibió mediante la Cuarentena Núm. 73 la importación a Puerto Rico de café crudo proveniente de países extranjeros. 7 C.F.R. sec. 319.73. Dicha cuarentena no protege a Puerto Rico de café crudo infestado que se importase de los Estados Unidos. Esa protección la da la Cuarentena Núm. 4 del Secretario de Agricultura de Puera Rico, promulgada bajo la autoridad que le confiere la Ley Núm. 35 de 1934 antes citada. De manera que ambas órdenes de cuarentena no están en conflicto, sino que se complementan entre sí, pueden coexistir y coexisten. Sería paradójico que la Cuarentena 73 que fué promulgada para proteger el café de Puerto Rico se utilizase ahora para dejarlo desvalido frente a un riesgo serio como el que presenta la plaga que tanto la Cuarentena 73 como la Cuarentena 4 se proponen combatir—el "Stephanoderes coffeae". Véase el texto de la Cuarentena Núm. 73 según redactado en el año 1940, 7 C.F.R. Suplemento de 1940, sec. 319.73.

■ No se presumirá que la reglamentación federal sustituye a la reglamentación estatal por el hecho de que el Congreso reglamente un área en forma limitada. Para que así sea es necesario que la ley del Congreso interpretada

razonablemente esté en conflicto real con la ley del estado, *Huron Portland Cement Co.* v. *Detroit*, 362 U.S. 440, 443 (1960); *Pueblo* v. *Burgos*, 75 D.P.R. 551, 562 (1953). En ausencia de una prohibición específica en la ley federal contra una ley local, la legislación insular que complementa la ley federal es válida siempre y cuando que la primera no esté sustancialmente en conflicto con la segunda, *Puerto Rico* v. *Shell Co.*, 302 U.S. 253 (1937); *Chabrán* v. *Bull Insular Line*, 69 D.P.R. 269, 291 (1948). El conflicto debe ser tan directo y positivo que las dos leyes no puedan armonizarse o coexistir al mismo tiempo, *Kelly* v. *Washington*, 302 U.S. 1, 10 (1937). Como dijimos en *Luce & Co.* v. *Junta de Salario Mínimo*, 62 D.P.R. 452, 459 (1943) "Para que pueda sostenerse que el estatuto Federal excluye una ley insular encaminada a proteger la salud y bienestar del público, no basta que las dos leyes abarquen la misma materia. Es preciso que la ley insular por sus propios términos o en su administración práctica esté en conflicto con la ley del Congreso o manifiestamente infrinja la política pública de la ley Federal."

█ Precisamente sobre este asunto de la protección de la industria del café en Puerto Rico puede señalarse que el Congreso ha sido liberal. Nótese que en beneficio de esa industria el Congreso ha delegado en el Gobierno de Puerto Rico la función de imponer tributos de importación. V. 13 L.P.R.A. sec. 2201 y ss.; el historial que aparece en la anotación a la sec. 2201; y 19 U.S.C. secs. 1319 y 1319 (a).

El cuarto error no se cometió. La controversia no consistía en el estado del café. Consistía en (1) si el Secretario estaba facultado para confiscar el café y (2) si la Ley Núm. 35 era válida. Sobre esas cuestiones ya nos hemos expresado. V. *Reid* v. *Colorado*, supra, en donde se sostuvo una convicción por importar al estado ganado en violación de la ley estatal. No se probó que el ganado estuviese enfermo. El Tribunal Supremo federal sostuvo que la cuestión envuelta

era que el ganado se importó sin habérsele hecho la inspección que la ley del estado requería, p. 140.

*La sentencia dictada por el Tribunal Superior, Sala de San Juan, en 30 de noviembre de 1959 será confirmada.*

